## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Nate Erickson, Amanda Horn, and Susan Bristlin, as joint trustees for Todd Erickson,<br><br>Plaintiff,<br><br>v.<br><br>Pope County, Minnesota, et al.,<br><br>Defendants. | Case No. 19-cv-3061 (SRN/LIB)<br><br>***Temporarily Filed Under Seal***<br><br>**MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT** |

J. Ashwin Madia and Zane A. Umsted, Madia Newville LLC, 1850 IDS Center, 80 S. 8th St., Minneapolis, MN 55402, for Plaintiffs.

Jason M. Hiveley, Stephanie A. Angolkar, and Aaron Mark Bostrom, Iverson Reuvers, 9321 Ensign Avenue South, Bloomington, MN 55438, for County Defendants.

Cally R. Kjellberg-Nelson and Dyan J. Ebert, Quinlivan & Hughes, PA, P.O. Box 1008, St. Cloud, MN 56302, for CentraCare Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on cross motions for summary judgment filed by the

County Defendants [Doc. No. 71], the CentraCare Defendants [Doc. No. 81], and Plaintiffs

[Doc. No. 85].[1]  Also before the Court is Plaintiffs' Motion for Sanctions for Spoliation of

---

[1] The Court refers to Defendants Todd County, Och, Wright, Kloos, Spanswick, and Mattson as the "Todd County Defendants," and Defendants Pope County, McCallum, and Riley as the "Pope County Defendants."  Collectively, the Court refers to them as the "County Defendants."  The Court refers to Defendants CentraCare, Sticha, Nimmo, and Hock as the "CentraCare Defendants."

Evidence [Doc. No. 103].  Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court grants in part, denies in part, and denies as moot in part the County Defendants' Motion for Summary Judgment, grants in part and denies in part the CentraCare Defendants' Motion for Summary Judgment, denies Plaintiffs' Motion for Summary Judgment, and defers ruling on Plaintiffs' Motion for Sanctions pending an evidentiary hearing.

## I.      BACKGROUND

In brief, on the morning of May 6, 2017, Todd Erickson was arrested by a Pope County Sheriff's Deputy for driving under the influence ("DUI") and initially booked into the Pope County Jail.  Around noon that day, Erickson was transported to the Todd County Jail, which had available space.  At the time of his arrest, and upon his arrival at both jails, Erickson displayed signs of alcohol intoxication. Todd County corrections officers placed him in a holding cell.  Due to Erickson's high level of intoxication, officers delayed booking and medical screening processes.  On three occasions between May 6 and 7, officers contacted the CentraCare Defendants regarding Erickson's various medications, seizures and/or medication for seizures, and possible concerns about symptoms of alcohol withdrawal.  At approximately 11:44 p.m. on May 6, officers booked Erickson into the Todd County Jail and completed a medical screening questionnaire.  At approximately 5:17 p.m. on May 7, 2017, Erickson experienced an apparent seizure in his cell and died due to complications of chronic alcoholism.

Plaintiffs Nate Erickson, Amanda Horn, and Susan Bristlin, as joint trustees for Erickson's heirs and next of kin, brought this action against the following groups of

Defendants:  (1) the Pope County Defendants (Pope County, Minnesota; Pope County Sheriff Timothy Riley; and Pope County Sheriff's Deputy Grace McCallum[2]); (2) the Todd County Defendants (Todd County, Minnesota; Todd County Sheriff Steve Och; Todd County Jail Administrator Scott Wright; and Todd County Corrections Officers Charles Kloos, Andrew Mattson, and Connie Spanswick); and (3) the CentraCare Defendants (CentraCare Health System – Long Prairie ("CentraCare"); Nurse Sandra Nimmo; Physician Assistant ("PA") Tom Hock, and Nurse Lori Sticha[3]).

Plaintiffs assert four claims against the Defendants.  First, pursuant to 42 U.S.C. § 1983, they assert a deliberate indifference claim involving violations of the Fourth and Fourteenth Amendments against Defendants McCallum, Kloos, Wright, Mattson, Spanswick, Nimmo, Hock, and Sticha.[4]  (Second Am. Compl. [Doc. No. 32] Count 1.) Second, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), they assert a policy, custom, or inadequate training claim against Defendants Pope County, Todd County, Riley, Och, Wright, and CentraCare.  (Second Am. Compl., Count 2.)  Third,

---

[2] Deputy McCallum has since married and changed her last name to Sorenson. However, the Court refers to her as "McCallum," because it was her name at the time of the underlying events, as is reflected in many of the exhibits, and she is named as "McCallum" in the Second Amended Complaint.

[3] Defendant Deborah Rasmussen, a CentraCare medical doctor and Defendant Hock's supervising physician, was previously dismissed from this action pursuant to the parties' stipulation.  (Oct. 26, 2020 Order [Doc. No. 47].)

[4] Plaintiffs note that healthcare workers are considered "state actors" subject to liability under § 1983 when performing duties pursuant to a contractual agreement with a state entity.  (Second Am. Compl. [Doc. No. 32] ¶ 97] (citing *West v. Atkins*, 487 U.S. 42, 55–57 (1988)).

under Minnesota law, Plaintiffs assert a negligence and wrongful death claim against all Defendants.  (*Id*., Count 3.)  Fourth, and also under Minnesota law, they assert a medical malpractice claim against the CentraCare Defendants.  (*Id*., Count 4.)

The County Defendants move for summary judgment, arguing that Plaintiffs' § 1983 claim is barred by qualified immunity, that Plaintiffs have failed to establish a *Monell* claim, and that Plaintiffs' wrongful death claim fails because the officers are entitled to official immunity and Erickson's death was not foreseeable.

The CentraCare Defendants also move for summary judgment, asserting that they did not commit a constitutional violation subjecting them to liability under § 1983, that Plaintiff's *Monell* claim fails because there is no evidence of an applicable policy, and Plaintiffs cannot establish their claims for negligence, wrongful death, and medical malpractice as a matter of law.

Finally, Plaintiffs move for summary judgment on their § 1983 claim against Wright, Kloos, Spanswick, and Todd County, and against Sticha, Nimmo, Hock, and CentraCare.  They argue that undisputed evidence regarding these Defendants establishes that they knew of Erickson's serious medical need and were deliberately indifferent to it, thereby establishing liability and precluding qualified immunity.  In addition, Plaintiffs seek summary judgment on their *Monell* claim, arguing that Todd County and CentraCare maintained an unconstitutional medication policy and inadequately trained jail officers.  As to their state law claims for negligence and wrongful death (Count 3) and medical malpractice (Count 4), Plaintiffs contend that they are entitled to summary judgment because:  (1) there is no dispute of material fact that Defendants breached their duty to

4

provide Erickson medical care, causing his death; (2) Defendants are not entitled to official immunity; and (3) the CentraCare Defendants failed to meet the applicable medical standard of care, establishing medical malpractice.

### A. Erickson's Arrest by Pope County Sheriff's Deputy Grace McCallum and Initial Detention at the Pope County Sheriff's Office

#### 1. Arrest

At approximately 9:00 a.m. on Saturday, May 6, 2017, Pope County Sheriff's Deputy Grace McCallum responded to a report of erratic driving near Glenwood, Minnesota.  (Angolkar Decl. [Doc. No. 76], Ex. 1 (McCallum Dep.) at 17–19; *id*, Ex. 2 (Incident Report) at 2 (stating, "Driving complaint – vehicle all over the road").) McCallum located the vehicle and observed it drive into the wrong lane.  (McCallum Dep. at 17–19.)  She stopped the driver, subsequently identified as Erickson, and observed three children in the back seat.  (*Id*. at 19; Incident Report at 47.)

After speaking with Erickson and establishing his identity, McCallum detected the smell of alcohol and observed that Erickson's speech was slurred and his eyes were bloodshot and watery.  (McCallum Dep. at 23; Incident Report at 13.)  She asked Erickson how much he had had to drink, to which he responded, "vodka," and admitted to drinking "a couple."  (McCallum Dep. at 23.)   McCallum asked Erickson to exit the car to perform field sobriety tests.  (*Id*. at 25–26.)  She observed him "stumbl[e]" out of the vehicle, "holding onto the side of the car to stand up."  (*Id*.)  Erickson informed McCallum that he was drunk, had back pain, and was unable to perform the field sobriety tests.  (*Id*. at 26–27.)   Nonetheless, McCallum attempted to perform the Horizontal Gaze Nystagmus

("HGN") test, which requires the test-taker to follow the movement of the officer's finger with their eyes.  (*Id*. at 28.)  Erickson was unable to follow McCallum's instructions, could not follow her finger, and had difficulty standing and maintaining his balance.  (*Id*.)  McCallum then administered the Preliminary Breath Test ("PBT"), which involves blowing air through a straw into a machine to measure blood alcohol content, or "BAC."  (*Id*. at 28–29.)  Because Erickson blew lightly into the straw, McCallum obtained what she described as a "weak sample."  (*Id*. at 29.)  Even so, Erickson's BAC was 0.327—over four times the legal limit.[5]  (*Id*.; Incident Report at 47.)

McCallum arrested Erickson for the offense of DUI and transported him to the Pope County Sheriff's Office.  (McCallum Dep. at 30.)  Another officer transported the passengers from Erickson's car, who were the children of Erickson's girlfriend, Cindy Klatt, to the Sheriff's Office.  (*Id*. at 30–32.)  McCallum phoned Klatt to inform her of Erickson's arrest and that her children were at the Sheriff's Office.  (*Id*. at 32–33.)

### 2.      Arrival at Pope County Sheriff's Office with Deputy McCallum

Upon arrival at the Pope County Sheriff's Office, McCallum removed Erickson's handcuffs and directed him to a seat.  (*Id*. at 34.)  At 9:27 a.m., she read him an implied consent advisory, informing him that Minnesota law requires a person suspected of DUI to submit to a chemical test to determine the presence of alcohol or drugs and that refusal to do so is a crime.  (*Id*.; Incident Report at 1.)  Erickson refused to take another test, stating that he was "pleading the fifth."  (McCallum Dep. at 25.)  McCallum observed Erickson

---

[5] Minnesota's legal BAC driving limit is 0.08.  (McCallum Dep. at 59.)

while completing forms and other booking procedures, and found him to be "an average drunk," who was able to sign and understand the forms, resulting in "a typical DUI process." (*Id*. at 38.)

McCallum testified that she had received no training on alcohol withdrawal syndrome or detoxification ("detox"). (*Id*. at 44.) Nor did she know or understand the procedures or treatment for persons at risk of alcohol withdrawal. (*Id*. at 46.) She understood that a person who drinks a lot of alcohol whose supply is cut off could be at risk of alcohol withdrawal. (*Id*. at 47–48.) At the time of Erickson's arrest, McCallum could identify shaking, sweating, confusion, and non-responsiveness as signs of alcohol withdrawal, but testified that she observed none of these symptoms in Erickson. (*Id*. at 45, 47.) McCallum also stated that based on her general knowledge, she understood the risks of alcohol withdrawal included "your body shutting down from not having alcohol in your system," potentially resulting in death. (*Id*. at 46.) She did not assess Erickson for the risk of alcohol withdrawal because she did not believe it was necessary. (*Id*. at 44.) In addition, she did not assess whether Erickson "drank alcohol a lot" because "[i]t[] [was] not my job to assess if he drinks alcohol a lot or not." (*Id*. at 50.) She also testified had she had no information to form a belief as to whether Erickson was an alcoholic. (*Id*.)

McCallum testified to her past experience in sending detainees to a detox center, which could arise if requested by the jail, if the jail refused to accept a detainee, or if she believed that detox was necessary. (*Id*. at 54–56.) She stated that she considered the following signs when determining whether a detainee required detox treatment:

"incoherent, unresponsive, not able to form sentences or communicate with me, not able to sign forms." (*Id*. at 54–55.)

As for determining when an arrestee requires medical treatment, Pope County offered no formal training, but McCallum testified that her years of on-the-job experience equipped her to make such decisions. (*Id*. at 57–58.) In addition to providing no formal training, she stated that Pope County had no protocols or standard operating procedures regarding medical care of arrestees. (*Id*.)

### 3. Conversation Between Deputy McCallum and Cindy Klatt

Because Pope County lacks a jail, the Pope County Sheriff's Office arranged for Erickson's transfer to the Todd County Jail. (*Id*. at 35.) Around the time of Erickson's transfer on May 6, Erickson's girlfriend, Cindy Klatt, arrived at the Pope County Jail. (*Id*. at 40.) McCallum testified that she spoke with Klatt, explaining that Erickson had been arrested and was being transported to the Todd County Jail. (*Id*.) McCallum asked Klatt whether she had observed Erickson drinking that morning, and recalled that Klatt responded in the negative, although Klatt acknowledged that Erickson had been drinking the previous night. (*Id*.) At the conclusion of their conversation, McCallum released Klatt's children to her care. (*Id*.)

Klatt also testified about her encounter with officers at the Pope County Jail. (Angolkar Decl., Ex. 3 (Klatt Dep.) at 49–51.) At one point, she spoke with a male officer who appeared from a back room where Erickson was detained. (*Id.* at 52.) Through the walls and the opened door, Klatt could hear Erickson "howling" and "hollering . . . like he was unhappy." (*Id*. at 52, 67.) The officer reassured her that Erickson would "sleep it off"

and be fine. (*Id*. at 52, 67.) Klatt also spoke with McCallum and recalled telling her that Erickson had been drinking earlier that morning, because she noticed alcohol on his breath when she gave him a kiss. (*Id*. at 50, 63.) Klatt stated that she told McCallum that Erickson was an alcoholic who needed help and he planned to obtain treatment within a few days. (*Id*. at 50, 68.) She also recalled telling McCallum that Erickson's biggest fear was that he would die from a withdrawal seizure, noting that because he had experienced a prior seizure, "he didn't want to have to go through another one without medicine." (*Id*. at 50, 63–64.) In addition, Klatt testified that she relayed her own concern that Erickson would go through withdrawal in jail, with no one knowing how to help him, and that Erickson would need help with alcohol withdrawal. (*Id*. at 68–69.) Klatt recalled that McCallum told her that Erickson "would be fine" and "they ha[dn't] had anybody die from any kind of a withdrawal issue in their jail." (*Id*. at 69.)

McCallum, however, denied that Klatt made any such statements about Erickson being an alcoholic, that he was in need of treatment, or that he was concerned about dying from alcohol withdrawal. (McCallum Dep. at 86–87.) If Klatt had expressed these concerns, however, McCallum agreed that they would have provided a reason to seek medical treatment for Erickson. (*Id*. at 87.) McCallum also denied telling Klatt that "we'll take care of him, we've never had anyone die [from withdrawals]." (*Id*.)

## B. Arrival at Todd County Jail the Afternoon of May 6, 2017

At 11:49 a.m., Todd County Sheriff's Deputy Robert Tirevold assumed custody of Erickson and transported him to the Todd County Jail. (McCallum Dep. at 39; Angolkar Decl., Ex. 4 (Tirevold Dep.) at 10–11; Kjellberg-Nelson Aff. [Doc. No. 84], Ex. N

(Transport Log).)   Because Erickson had not eaten and it was close to the lunch hour, Deputy Tirevold stopped at a fast food restaurant along the way.  (Tirevold Dep. at 12–13.) Deputy Tirevold picked up the county's standard prisoner meal, consisting of a hamburger, fries, and milk, and handed it to Erickson in the backseat.  (*Id*. at 19.)  Deputy Tirevold could not recall Erickson's overall state during the ride, nor could he recall if Erickson slept at any point.  (*Id*. at 18–19.)

Upon arrival at the Todd County Jail around 12:42 p.m., Deputy Tirevold escorted Erickson into the booking area.  (*Id*. at 19–21; Umsted Decl. [Doc. No. 91], Ex. 8 (Defs.' Answers to First Interrogs.) at No. 12).)  Todd County Corrections Officer Charles Kloos and Jail Administrator Scott Wright were on duty.  (Tirevold Dep. at 20.)  Officer Kloos knew that Erickson would be arriving from Pope County, following a DUI arrest, and recalled that Erickson walked into the facility under his own power, without any assistance, and was cooperative and coherent.  (Kloos Dep. at 26–27, 30.)  Wright testified that he and Kloos knew of Erickson's 0.327 BAC, taken earlier in the day.  (Angolkar Decl., Ex. 8 (Wright Dep.) at 94–96.)

Kloos performed a pat search and asked approximately nine to twelve emergency health-related questions to determine if Erickson had any immediate medical issues such as the use of a pacemaker or if he was undergoing cancer treatment.  (Kloos Dep. at 27–28; Wright Dep. at 88, 91–92.)  Kloos stated that during this interaction, he could observe Erickson's ability to answer questions, communicate, and move on his own.  (Kloos Dep. at 79–80.)   Kloos and Wright then placed Erickson in a holding cell while they attended to various other tasks and inmates.  (Kloos Dep. at 32, 35.)

10

The Todd County Jail's written Policies and Procedures state that "booking is the admission of a person," and admission occurs "upon entry" into the jail. (Umsted Decl., Ex. 109 (Todd Cnty. Jail Policies) at P/T 3650–51.) Among other things, the booking process includes medical screening, and jail staff are required to obtain and document "[a]ll emergency medical information" within two hours of an inmate's admission. (*Id.* at P/T 3561, 3714.) The policy provides for the completion of a medical intake form, described as a "tool for gathering all needed medical information on every prisoner and every arrest." (*Id.* at P/T 3714–15.) On the medical intake form, jail staff are required to identify any safety risks that the inmate poses to himself or others, using the resulting classification to identify any special needs and to "determine where the inmate shall be housed." (*Id.*)

The jail's procedure for the admission of intoxicated persons requires that all intoxicated persons brought to the jail for purposes of detention submit to a test to determine their BAC. (*Id.* at P/T 3673.) It further states, in relevant part:

> Any person who refuses to submit to said test or admits to being a chronic alcoholic or any person who opts for blood or urine test may, after close observation of his/her mental and or physical capabilities, be either transported to the Detox Unit if showing a high impairment and is not combative or may be held in the jail if it has been determined that he/she shall not present a risk to them self [sic], other inmates or staff.

> Officers bringing an intoxicated person to the jail who has already submitted to a breath test would be required to provide a copy of the intoxylizer test report sheet for the jail staff that indicates the inmate's breath alcohol content.

> Staff members may also refuse to accept any individual who displays what would be considered higher than normal impairment to either their mental or physical state.

(*Id.*)

11

Kloos acknowledged that he had past experience with inmates whose intoxication levels prompted a hospital medical evaluation prior to jail admission. (Kloos Dep. at 106–07.) Similarly, Wright acknowledged that the jail would not safely admit or house certain persons due to their level of intoxication. (Wright Dep. at 33–35.) Furthermore, he agreed that, in accordance with the jail's policies and procedures, if an arrestee's level of intoxication prevents them from being safely booked into the Todd County Jail, then the arrestee needs medical attention and should not be in the jail. (*Id*. at 106.) Wright testified that failure to provide medical attention under such circumstances could create an unacceptable risk of an adverse health outcome, including death. (*Id*. at 100.)

In response to Plaintiffs' interrogatories, Todd County stated that Erickson was not immediately booked into the jail due to his level of intoxication. (Defs.' Answers to First Interrogs. at No. 14.) But Kloos testified that he did not book Erickson upon his arrival, nor did he perform the full, documented medical screening, because the facility was very busy. (Kloos. Dep. at 35–36.) Kloos could not recall whether the jail was filled to capacity, but acknowledged that when the Pope County Sheriff's Department asked if the Todd County Jail had space for Erickson, he had responded affirmatively. (*Id*.) Although work activity had settled down by 1:30 or 2:00 p.m. on May 6, Kloos did not book or medically screen Erickson at that time.

At 2:26 p.m., Kloos searched the driver's license database and found that Erickson had a long history of alcohol-related offenses. (Umsted Decl., Ex. 3 (Todd Cnty. Jail File) at P/T 37–38.) In fact, the records revealed that Erickson was once required to surrender

his driver's license, attend rehabilitation, and he risked the invalidation of his license if he used alcohol or drugs in the future. (*Id*.)

Kloos testified that he did not book or medically screen Erickson by 3:00 p.m. because he was nearing the end of his shift and would need more time to complete these processes. (Kloos Dep. at 38–39, 44.) Kloos was aware that Erickson had arrived with several types of medication and knew it would take time to identify them, log them, and consult with nursing staff. (*Id*. at 40–41.) In the meantime, Erickson, who was in a holding cell, was placed on 30-minute well-being checks. (*Id*. at 51–52.)

Pursuant to a 2015 medical consultant agreement between Todd County and CentraCare, inmates in the Todd County Jail received medical guidance and care from CentraCare. (Umsted Decl., Ex. 6 (2015 Todd Cnty./CentraCare Agmt.).) At approximately 4:34 p.m. on May 6, Officer Kloos phoned CentraCare to ask about Erickson's medications, including the purpose for which they were prescribed. (Kloos Dep. at 41; Angolkar Decl., Ex. 9 (Sticha Dep.) at 80.) Erickson's medications were on hand, having come with him from Pope County. (Kloos Dep. at 40–41.) Kloos spoke with CentraCare Nurse Lori Sticha, and testified that the conversation was limited to the subject of Erickson's medications. (*Id*. at 42, 46–48, 157.) He recalled telling Sticha that Erickson was intoxicated, informing her of Erickson's specific medications, and asking how all of them would "mesh together." (*Id*. at 42, 46–47.) According to Kloos, Sticha stated that Kloos could provide the medications to Erickson on the normal, prescribed schedules and it was "Erickson's choice" as to the time of day. (*Id*. at 42–43, 69.) Kloos recalled that

Sticha informed him that Erickson would likely refuse to take a particular medication used to treat alcoholism because it would make him sick to his stomach. (*Id*. at 41–43.)

In light of the prescription intended to treat alcoholism and because Erickson was in jail for a DUI offense, Kloos inferred that Erickson was an alcoholic. (*Id*. at 43.) Kloos could not recall whether Nurse Sticha had warned him to be watchful for any particular medical conditions or to place Erickson on a 15-minute watch, and he testified that she did not tell him to check Erickson's pulse, temperature, or for signs of perspiration. (*Id*. at 48–49.)

Kloos informed Wright about his conversation with Sticha. (*Id*. at 67.) However, Kloos did not dispense Erickson's medications at that time. Rather, he decided to wait until Erickson's BAC reached 0.00, based on the jail's practice. (*Id*. at 69–70; 159–60 ("I don't know whether that policy was from Ms. Sticha or where that policy originated from, but that was practiced at the time."); *see also* Angolkar Decl., Ex. 19 (Sobiech Dep.) at 127–28 ("That was just, at the time, what we were told."); Wright Dep. at 82 ("That's what [CentraCare] would instruct us, yes. Q: And, that's regardless of what the inmate's symptoms are, what the medication is, or what the concern is? Just, no matter what, for every inmate, the standing order is that they should not get medication until their BAC is zero? A: That's what we were instructed.").)

Based on Kloos' belief that Erickson was an alcoholic, and his observation of Erickson's overall condition, he knew that Erickson was at "very high risk" of alcohol withdrawal. (Kloos Dep. at 71–72 ("Q: So at the time, then, particularly after your conversation with Sticha, you knew Erickson was at a very high risk for alcohol

withdrawals, correct?   A:   Correct.").   Kloos testified that he communicated this information to Wright.  (*Id*. at 72.)

While Kloos testified that he had received training on alcohol withdrawal prior to May 6, 2017, he deferred to his training logs as the best evidence of the timing of that training.  (*Id*. at 108–17.)  His training logs do not reflect any training prior to May 6, 2017, (Umsted Decl., Ex. 200 (Kloos Training Logs) at P/T 9144), which is consistent with the recollection of fellow corrections officer Cristina Sobiech.  (Sobiech Dep. at 72) (stating that alcohol withdrawal training information and protocol found in Ex. 124 came after Erickson's death).  In any event, regardless of the timing of any such training, Kloos testified that as of May 6, 2017, he knew the information ultimately contained within the protocol, including that alcohol withdrawal could be fatal, and for chronic alcoholics, withdrawal could begin when the person was still intoxicated.  (Kloos Dep. at 71, 114.)

Jail Administrator Wright could not specifically recall whether he received the alcohol withdrawal protocol prior to May 6, 2017, nor could he recall whether he had distributed the protocol to jail staff or provided any training.  (Wright. Dep. at 148.)  However, as of May 6, 2017, Wright himself was generally aware of the signs and symptoms of alcohol withdrawal that the subsequently-issued protocol identified.  (*Id*. at 148–49.)

Wright acknowledged that he did not request or provide any medical treatment to Erickson on May 6 or 7.  (*Id*. at 137.)  Neither Kloos nor Wright sent Erickson to the hospital or detox.  (*Id*.)  Wright testified that as a general matter, the procedure for sending

an inmate to the hospital involved either directing an officer to transport the inmate, or placing a phone call with the Sheriff's Department's dispatch staff. (*Id*. at 156–57.)

The jail's activity log indicates that officers performed well-being cell checks on Erickson during the afternoon of May 6. (Angolkar Decl., Ex. 11 (Activity Log) at 4.) Kloos found that Erickson had a high level of intoxication, but not a high level of impairment. (Kloos Dep. at 139.) However, Kloos acknowledged that Erickson's level of intoxication would make the booking and screening process "considerably less reliable,"— so much so that he did not book or medically screen Erickson during his shift. (*Id.* at 139– 40.) Although Erickson was impaired to such a degree that Kloos could not perform these procedures and was non-combative, Kloos saw no need to transport Erickson to a detox facility. (*Id.* at 140.) Kloos was unaware that Erickson had refused a BAC test earlier in the day at the Pope County facility, but testified that "the refusal would be of no difference to us," and saw no need to transfer Erickson to a detox facility. (*Id*.)

Kloos was aware of the Todd County Jail's policy requiring more frequent observation of "inmates with special needs," such as those considered suicidal, mentally ill, or experiencing withdrawal from drugs or alcohol. (*Id*. at 141; *see also* Todd Cnty. Jail Policies at P/T 3712–13.) The policy provides that once staff identify an inmate with special needs, they are to contact the jail administrator to develop a plan "to best care for the inmate." (Todd Cnty. Jail Policies at P/T 3735.) The plan "shall more than likely include being transported to another facility that has additional resources to provide the care necessary for the inmate." (*Id*.) Although Kloos had received training on the policy,

16

he testified that he observed no symptoms of withdrawal in Erickson, such as skin color changes, curling into a ball, or violent shaking. (Kloos Dep. at 141.)

Jail Administrator Wright testified that Erickson did not seem severely intoxicated, although he observed him walking at a slower pace, as if he had back problems. (Wright Dep. at 90.) He could recall no loss of balance or unsteadiness in Erickson during his pat-down search, during which Erickson stood on his own. (*Id*. at 91.) Based on the fact that there was no documentation of any medical issues in response to Officer Kloos' initial questions nor a call to a nurse to discuss any such issues, Wright assumed that Erickson had denied having any medical issues. (*Id*. at 92.) Wright recalled that Erickson was coherent and responsive during Kloos' intake, and nothing about Erickson's condition suggested to Wright that Erickson was too intoxicated to admit to the jail. (*Id*. at 97.) For instance, he testified that Erickson was not so intoxicated that he was unable to submit to a pat search, make a phone call, photograph, fingerprint, or answer initial medical questions. (*Id*. at 98.) However, Wright also acknowledged that Erickson was too intoxicated to be booked for nearly 12 hours, despite the jail's standard policies and protocols requiring inmates to be booked upon entry into the jail. (*Id*. at 102–03, 105.)

Kloos testified that in advance of the 6:00 p.m. shift change on May 6, he and Wright briefed the incoming officers, Connie Spanswick and Andrew Mattson, on the need to check Erickson's BAC in order to administer medications when Erickson's BAC reached 0.00, per jail policy. (Kloos Dep. at 58–59.) Mattson recalled that Wright and Kloos told him in words to the effect that Erickson "was super drunk," was unable to book into jail when he arrived, and "was passed out in his holding cell." (Umsted Decl., Ex. D (Mattson

Dep.) at 15–16.)  However, Mattson also testified that he could not recall whether Kloos

informed him that Erickson was "severely intoxicated." (*Id*. at 27.)  Kloos testified that he

told Spanswick and Mattson that Erickson was at "very high risk" for alcohol withdrawal.

(Kloos Dep. at 72.)  By the time Kloos ended his shift at 6:00 p.m., Erickson had still not

been booked or medically screened, (*id*. at 49), nor had he received any of his medications.

### C.    Detention in Todd County Jail, Evening of May 6, 2017 and Early Morning of May 7, 2017

Officer Spanswick testified that when she arrived at work the evening of May 6, she

assumed that Erickson must have been sleeping, because she typically books inmates into

jail "right away." (Angolkar Decl., Ex. 13 (Spanswick Dep. at 23).)  However, she stated

that it is common practice to delay an inmate's booking process if they are intoxicated and

sleeping, and that a variety of other circumstances, e.g., combativeness, methamphetamine

use, or bladder  problems, can delay the process.  (*Id*. at 26–29.)  Spanswick could not

recall whether Kloos and Wright had informed her about Erickson's medications, but she

testified that neither Kloos nor Wright had informed her about Erickson's medication used

to treat alcoholism, nor had they shared that Erickson was possibly an alcoholic.  (*Id*. at

24–26.)

Officer Mattson testified that during his well-being rounds, which he said occurred

every 15 minutes, he observed that Erickson was incoherent.  (Mattson Dep. at 15, 27.)  He

noted that when Spanswick talked to Erickson, Erickson "moved a little bit and that was

about it."  (*Id*. at 18–19; 75.)  During Mattson's rounds, he would occasionally talk to

Erickson himself, but if he could see him breathing, he would do nothing further.  (*Id*. at

75.)  However, if Mattson was uncertain whether Erickson was breathing, he would yell or scream at him to get his attention and see if he moved.  (*Id*.)  Although Mattson was uncertain whether he ever entered Erickson's cell during his rounds, he was "pretty sure" that he did in order "to make sure that he was breathing."  (*Id*. at 82–83.)  While Mattson agreed that it would be important to document whether he had entered Erickson's cell, he was unsure whether he had done so in the jail logs.  (*Id*. at 83.)  He testified that he did nothing else, other than the welfare checks, to provide medical care to Erickson, and did nothing to assess the risk of alcohol withdrawal.  (*Id*.)  Mattson, who was in training at the time, was unaware that he had the ability to send Erickson to a detox facility, hospital, or medical provider.  (*Id*. at 10–11, 77.)

Later that evening, Spanswick permitted Erickson to make a call to his girlfriend, Ms. Klatt, and placed the call on speaker phone.  (Spanswick Dep. at 21, 24–26.)  During the call, Erickson told Klatt that he was in jail,  apologized for the "accident" while her children were passengers in the car, and speculated that because one of the car's side mirrors had broken off, he had hit a mailbox.  (Klatt Dep. at 53–54.)  He also asked Klatt if she would attend his court proceeding on Monday.  (*Id*. at 56.)

At approximately 11:44 p.m. on May 6, Spanswick and Mattson began the process of booking Erickson into the jail, (Mattson Dep. at 17, 33–34), approximately 11 hours after he had first arrived.  (Defs.' Answers to First Interrogs. at No. 12.)  Mattson testified that they decided to start the process because Erickson had begun responding to their questions, rather than simply rolling over in his bed and not answering.  (*Id*. at 35.)  Spanswick and Mattson spoke with him to complete the booking questionnaire.  (*Id*. at 37–

38; Angolkar Dep., Ex. 15 (Booking Intake Questionnaire).)  Both Spanswick and Mattson testified that they did not assess Erickson for alcohol withdrawal risks.  (Spanswick Dep. at 53–58; Mattson Dep. at 83 ("[Q]: Did you do anything to assess his risk of alcohol withdrawals?  A:  I didn't know anything about alcohol withdrawals.").)  However, in response to Plaintiffs' interrogatory asking Todd County to identify any personnel who assessed Erickson's risk of drug or alcohol withdrawal, the County answered, "CO Andrew Mattson performed risk assessment during booking."  (Defs.' Answers to First Interrogs. at No. 9(g).)  During booking, Erickson registered a 0.12 BAC.  (Todd Cnty. Jail File at P/T 31; Mattson Dep. at 38–39.)

On the portion of the form for mental health screening, Mattson testified that he did not check a box identifying Erickson as "[u]nder the influence of drugs/alcohol" because he believed that Erickson was coherent.  (Mattson Dep. at 38; Booking Intake Questionnaire at 29.)  Spanswick and Mattson asked Erickson questions about his medications.  (Mattson Dep. at 34; Booking Intake Questionnaire at 35.)  Based on information that Erickson provided, Mattson noted on the booking form that Erickson was prescribed Lorazepam for seizures and was "on meds" for high blood pressure.  (Todd Cnty. Jail File at P/T 35.)  Neither he nor Spanswick administered any medications.  (*Id*. at P/T 51) (noting no medications administered until 12:08 p.m. on May 7).

At approximately 12:43 a.m. on May 7, Spanswick contacted CentraCare medical staff and spoke with Nurse Sandra Nimmo.  (Angolkar Ex. 16 (Chart Notes) at CC-46; Spanswick Dep. at 36–37.)  Spanswick informed Nimmo that Erickson, who had been admitted to jail the previous day with a BAC of 0.32, now registered a BAC of 0.12 and

was "requesting 'seizure medication.'"  (Chart Notes at CC-46; Spanswick Dep. at 37–38;

Angolkar Decl., Ex. 17 (Nimmo Dep.) at 60–61.)  Spanswick documented the call in

Erickson's jail records as follows: "on the phone with other County and hospital for inmate

regarding seizure activity."  (Todd Cnty. Jail File at P/T 52.)  She has no independent

recollection as to whether Erickson had requested seizure medication.  (Spanswick Dep. at

45.)

In her deposition, Spanswick could not recall the "seizure activity" to which she had

referred in the jail log, but speculated that she "probably typed it wrong," and meant to

write "seizure medication."  (*Id*. at 79–80, 91.)   CentraCare's chart notes for the call

contain no reference to Erickson experiencing a seizure in jail.  (*See* Chart Notes at CC-

46.)  However, Spanswick also testified that she was familiar with the signs of a seizure,

and if Erickson had simply asked for seizure medication, she would not have documented

it, but would have simply called the nurse.  (Spanswick Dep. at 45–46.)

Spanswick also testified that if Erickson had experienced a seizure, she would have

called Wright or completed an incident report.  (*Id*. at 44) ("[I]f there wasn't me contacting

my boss for medical reasons, I would've done an incident report.").  Call records from the

jail indicate that someone from the jail phoned Wright at 12:07 a.m. on Sunday morning,

before Spanswick phoned CentraCare at 12:43 a.m.  (Umsted Decl., Ex. 201(a) (Call

Records) at Row 129 (reflecting call to Wright's cell phone at "5:07" a.m.); Umsted Decl.,

Ex. 202 (Email) (explaining that Ex. 201 reflects GMT time, and directing to website

instructing to subtract five hours to convert to Central Time); Wright Dep. at 155

(confirming cell phone number).)  Wright has no recollection of Spanswick or Mattson phoning him to report seizure activity.  (Wright Dep. at 128.)

As reflected in CentraCare's medical records, during Spanswick's call with Nurse Nimmo, Spanswick noted Erickson's medications, which included Lorazepam and Vicodin, and stated that Erickson had asked to take these two drugs.  (Chart Notes at CC-46.)  Spanswick also stated that Erickson had gotten up to use the bathroom and eaten some food without concerns.  (*Id.*)  Nimmo told Spanswick that none of Erickson's medications were prescribed for seizures, that Lorazepam was "for anxiety,"[6] and that she would not give Erickson any Vicodin when he had a BAC of 0.12.  (*Id.*)  Although Spanswick knew that Erickson had identified Lorazepam as his seizure medication during booking, (Todd Cnty. Jail File at P/T 35; *see also* Spanswick Dep. at 51), the medical records contain no mention of this information.  (*See* Chart Notes at CC-46.)  Nor do the medical records indicate that Spanswick informed Nimmo about Erickson's unresponsive and incoherent condition earlier in the evening, that he was too intoxicated to be booked into the jail for 11 hours, or that he was at "very high risk" of alcohol withdrawal.  (*See id*.)

At 1:27 a.m., Nimmo phoned Spanswick after she had spoken with CentraCare PA Tom Hock.  (*Id*.; Nimmo Dep. at 64–65.)  Nimmo relayed that Hock had reviewed

---

[6] CentraCare's expert, Thomas D. Fowlkes, M.D., acknowledges that Lorazepam is used for the treatment of alcohol withdrawal, stating, "The generic lorazepam is also known by the brand name Ativan.  It is a benzodiazepine which is a sedative-hypnotic and is a controlled substance.  It is used for the treatment of anxiety, but benzodiazepines are also the treatment of choice for alcohol withdrawal."  (Umsted Decl., Ex. R (Fowlkes Report) at 13.)

Erickson's BAC and his medications and advised against giving Erickson any of his medications until his BAC was 0.00.  (Chart Notes at CC-46; Nimmo Dep. at 64–65.) Spanswick has no independent recollection of the calls with Nimmo.  (Spanswick Dep. at 43–44.)

Spanswick was familiar with the signs and symptoms of alcohol withdrawal, such as shaking, sweating, difficulty functioning, and the inability to answer questions or follow directions.  (*Id*. at 47–48.)  She and Mattson performed well-being cell checks at various points during the early morning hours of May 7 and reported no issues.  (Activity Log at 3.)  They did not test Erickson's BAC for the remainder of their shift to determine when he could receive his medications.  (Defs.' Answers to First Interrogs. at No. 8 (identifying only two BAC tests at the Todd County Jail); Kloos Dep. at 84 (stating that BAC tests would be logged if they occurred).)

### D.   Detention in Todd County Jail the Morning of May 7, 2017

#### 1.   Prior to Erickson's Death

Corrections Officer Kloos returned to work the morning of Sunday, May 7 for a shift starting at 6:00 a.m., initially joined by Wright.  (Kloos Dep. at 80.)  Corrections Officer Cristina Sobiech relieved Wright between 10:30 and 11:30 a.m.  (Sobiech Dep. at 83.)  As Kloos booked other inmates into the jail, he could hear Erickson snoring loudly. (Kloos Dep. at 82.)

After Erickson ate lunch in his cell, Sobiech collected the lunch waste, and Erickson asked about taking his medications.  (Umsted Decl., Ex. 204(a)-(i) (Jail Video) at 11:49:31-

11:49:45.)[7] He told Sobiech that he was "sicker now" and that he "didn't sleep real well last night." (*Id*. at 11:49:40-11:49:45.) Sobiech asked Erickson if he was "at zeroes," in reference to his BAC, to which Erickson replied that he did not know. (*Id*. at 11:49:48-11:50:00.) Sobiech testified that she was trained, possibly by "the jail nurse," that inmates could not take medications unless their BAC was 0.00. (Sobiech Dep. at 128.)

Approximately ten minutes later, Kloos tested Erickson's BAC. (Jail Video at 12:03:09-12:03:30.) The test occurred nearly twelve hours after Hock had directed officers to withhold Erickson's medications until his BAC was 0.00. (Defs.' Answers to First Interrogs. at No. 8) (identifying only two BAC tests at the Todd County Jail); Kloos Dep. at 84 (stating that BAC tests would be logged if they occurred).) To take the test, Erickson exited his cell and sat at a desk in the nearby booking area. (Jail Video at 12:03:09-12:03:30.) Kloos administered the test, which resulted in a BAC of 0.00, and during this interaction, Erickson frequently wiped has hands across his face and head. (*Id.* at 12:03:31-12:05:08.) Kloos knew that sweating is a symptom of alcohol withdrawal. (Kloos Dep. at 94.) When Kloos escorted Erickson back to his cell after the BAC test and prior to dispensing the medications, Erickson asked for an extra blanket, stating that it was "cold as hell in here." (Jail Video at 12:04:56-12:05:03.) Kloos also knew that "trying to stay

---

[7] Plaintiffs filed the Jail Video at Ex. 203(a)–(i) to the Umsted Declaration [Doc. No. 91], and the Cell Video at Ex. 204(a)-(j) to the Umsted Declaration, both of which present portions of the videos in smaller time increments. The County Defendants also filed these videos, (Wright Decl. [Doc. No. 75], Ex. 1), as did CentraCare. (Kjellberg-Nelson Aff. [Doc. No. 84], Ex. 21.) The Court's pin-point citations for the videos refer to the official time stamps, without regard to whether they were offered as exhibits to Plaintiffs' motion or Defendants' motions.

warm" was a symptom of alcohol withdrawal, but testified that the jail was cold all the time.  (Kloos Dep. at 141–42.)

Shortly thereafter, at 12:08 p.m., Kloos reviewed Erickson's medications with him at the booking desk.  (Jail Video at 12:08:29-12:14:06; Kloos Dep. at 83.)  Erickson took his prescribed doses of Lorazepam, Bupropion, Potassium, Magnesium Oxide, and Amlodipine, but declined to take a generic version of Antabuse because it would cause stomach upset.  (Jail Video at 12:10:44-12:11:00; Angolkar Decl., Ex. 12 (Med. Log.).)  Erickson also agreed to delay taking Hydrocodone until bedtime, as prescribed.  (Kloos Dep. at 86; Jail Video at 12:10:23-12:10:28.)   When taking one of his medications, Erickson remarked that he had been shaking and used two hands to drink water from a cup. (Jail Video at 12:11:35.)  Kloos testified to his awareness that shaking is a symptom of alcohol withdrawal.  (Kloos Dep. at 94, 141.)   When Erickson finished taking his medications, he stood up from the chair and walked back to his cell without assistance. (Jail Video at 12:13:54-12:14:00.)

At 12:19 p.m., Kloos logged a note in Erickson's jail file stating, "Nurse called for advice on DTs."  (Todd Cnty. Jail File at P/T 51.)   Kloos described DTs as a symptom of "severe alcohol withdrawal," and explained that based on Erickson's level of intoxication, he called CentraCare "to make sure that I wasn't missing anything that would affect the health and well-being of Mr. Erickson."  (Kloos Dep. at 93.)  Wright testified that Todd County corrections officers are required to obtain medical care for inmates experiencing DTs.  (Wright Dep. at 192; *see also* Sobiech Dep. at 67.)  Kloos reached Nurse Sticha, and described his "concerns about [Erickson] coming down from being so drunk because of

withdrawals." (Umsted, Ex. 9 (Defs.' Answers to Second Interrogs.) at No. 17.) Kloos testified that Sticha told him to look for "normal day-to-day health concerns, . . . to be watching for sweating and tremors and, you know, further signs of alcohol withdrawal symptoms." (Kloos Dep. at 93–94.) In Erickson's jail log, Kloos noted that Sticha advised that Erickson's medications "would be sufficient for DTs," (Todd Cnty. Jail File at P/T 51), but he later testified that he understood her to mean that Erickson's medications would be sufficient for Erickson's preexisting conditions in general. (*Id*. at 93–95.)

Although Kloos had called Sticha to discuss DTs, Sobiech testified that that did not necessarily mean that Erickson was experiencing DTs. (Sobiech Dep. at 136–37.) Rather, Sobiech believed that Kloos had phoned Sticha to "get ahead of the game." (*Id*. at 135–36.)

At approximately 1:37 p.m., as Kloos performed a well-being check on Erickson, he asked him, "The shaking getting a little better?" (Jail Video at 13:38:58-13:39:01.) The video ends before Erickson responds. Kloos then told Erickson that Erickson was "coming off of everything here for a little bit," and that "it'll get better." (*Id*. at 13:39:09-13:39:15.) Erickson again stated that it was "cold as hell in here," and Kloos gave him "one more" blanket. (*Id*. at 13:39:16-13:39:22.)

At 2:31 p.m., Erickson emitted a loud sound, possibly a groan, that was audible from the booking desk. (Jail Video at 14:31:43.) Kloos looked into the window of Erickson's holding cell, then walked away. (*Id*.) Sobiech checked on Erickson at 2:49 p.m., after which Erickson appeared to make similar sounds, but neither Kloos nor Sobiech checked on him afterwards. (*See id*. at 14:49:55, 14:51:35.)

26

During a well-being check at 3:26 p.m., Erickson asked that the light be turned off, but was told that it must remain on.  (*Id*. at 15:26; Kloos Dep. at 104.)  From 3:26 p.m. to 5:06 p.m., Kloos booked inmates into jail at the booking desk, located in close proximity to Erickson's cell.  (Kloos Dep. at 82; Jail Video from 15:26-17:06.)  Kloos testified that he could also see Erickson on a surveillance camera monitor located near the booking desk.  (Kloos Dep. at 100.)

## 2.    Erickson's Death

Kloos and Sobiech logged well-being checks at 3:30 p.m., 4:22 p.m., 4:30 p.m., and 4:59 p.m., (Todd Cnty. Jail File at P/T 50), but a subsequent investigation found that they had conducted no well-being checks during a 52-minute period between 4:14 p.m. and 5:06 p.m., despite the log entries and Sticha's instruction to be alert to any "further signs of alcohol withdrawal symptoms."  (Umsted Decl., Ex. 90 (DOC Investig. Report) at TEMNDC 4; Kloos Dep. at 102.)  Sobiech denied that she had logged checks that were not actually completed, (Sobiech Dep. at 93), although Kloos acknowledged that some of the well-being checks "were not done."  (Kloos Dep. at 102.)  Sobiech testified that she did not see any signs that Erickson was experiencing alcohol withdrawal, such as shaking, when she brought him lunch.  (Sobiech Dep. at 137–38.)  She observed Erickson get up to use the bathroom and use the intercom "just fine."  (*Id*. at 138–40.)

Todd County preserved and produced video taken in Erickson's cell starting only from 5:00 p.m. on May 7.[8]  Video footage shows that by 5:00 p.m., Erickson continuously and loudly exhaled, wheezed, and tossed and turned under his blankets.  (Umsted Decl., Ex. 204(a)-(j) (Cell Video) at 17:00:31-17:01:19.)   At one point, Erickson groaned, muttered "fuck me," and awkwardly sat up before shuffling to the toilet while breathing heavily.  (*Id*. at 17:02:04-17:02:44.)  Upon returning to his bed, he continued to exhale loudly, curled into a ball, and attempted to cover himself with blankets from head to toe, placing a blanket entirely over his head.  (*Id*. at 17:02:56-17:04:11.)  At another point, he appears to mutter words to the effect of "are you alive?"  (*Id*. at 17:06:28-17:06:29.)

At 5:06 p.m., Sobiech conducted a well-being check that was not listed on the log. (DOC Investig. Report at TEMNDC 26.)

At 5:17 p.m., Erickson snored loudly, tensed his body, his hands trembled slightly, and he rolled off the bed onto the floor.  (Cell Video at 17:17:00-17:17:20.)  His breathing was very labored.  (*Id.*, *see also* DOC Investig. Report at TEMNDC 26.)   After lying motionless on his right side for a few seconds, he rolled onto his stomach and tensed his body.  (Cell Video at 17:17:21-17:17:31.)   He held this position for approximately one minute, making jerking movements with his arms and legs, before becoming unresponsive. (*Id*. at 17:17:32-17:18:26.)  He emitted snorting sounds from his throat.  (*Id*. at 17:18:31-

---

[8] The lack of jail cell video prior to 5:00 p.m. is the subject of Plaintiffs' Motion for Sanctions, discussed *infra* at II.F.

17:18:37.)  At this point, the video ended because the cameras are programmed to stop when there is very little or no motion.  (DOC Investig. Report at TEMNDC 26.)

Around this time, Cindy Klatt arrived at the jail to visit Erickson.  (Klatt Dep. at 54–55.)  Spanswick entered Erickson's cell at approximately 5:21 p.m. to report that he had a visitor. (Spanswick Dep. at 93–94.)  She found Erickson unresponsive on the floor and summoned Kloos, who also entered the cell at that time. (Cell Video at 17:21:38; Todd Cnty. Jail File at P/T 50; Spanswick Dep. at 93–94.)  Kloos detected that Erickson had a weak pulse, (Kloos Dep. at 98; Sobiech Dep. at 84), while Sobiech attempted to communicate with Erickson.  (Cell Video at 17:21–17:22.)  At 5:23, Kloos and Sobiech contacted dispatch, requesting oxygen.  (DOC Investig. Report at TEMNDC 26.)  At 5:26, a police officer arrived with oxygen and administered it to Erickson, and at 5:27 paramedics arrived with an ambulance.  (*Id.*)   While paramedics attended to Erickson, Kloos spoke from outside the cell, identifying Erickson's medications and stating that Erickson was taking Lorazepam for seizures and had high blood pressure.  (Cell Video at 17:29:08-17:29:18.)  Paramedics transported Erickson to the Long Prairie Hospital, where he was pronounced dead at 6:03 p.m.  (Angolkar Decl., Ex. 20 (Confidential Med. Examiner Final Summary).)

The medical examiner determined that Erickson died from complications of chronic alcoholism, and had significant heart disease. (Todd Cnty. Jail File at P/T 63 ("complications of chronic alcoholism"); Umsted Decl., Ex. L (Madsen Dep.) at 18–20 (testifying, as the medical examiner who performed Erickson's autopsy, to a reasonable

degree of medical certainty that Erickson's alcohol withdrawal symptoms stressed his heart, triggering the arrhythmia that ultimately caused his death).

Subsequently, a Minnesota Department of Corrections inspector reviewed the circumstances of Erickson's death in the Todd County Jail and found two violations of Minnesota Chapter 2911 rules regarding the timing of well-being checks and inaccurate logging of the checks. (Angolkar Decl., Ex. 21 (Portion of DOC Investig. Report) at P/T 65.) The DOC inspector, Greg Croucher, stated, "On the day of the incident several well-being checks were not completed within 30 minutes of the previous check. Most concerning was a gap between 1614–1706 (52 minutes)." (*Id*.) Croucher observed that jail staff appeared to be performing other duties at that time, but "well-being checks should be primary and staff need to prioritize their workload so that checks are not late or missed." (*Id*.) Croucher noted that Jail Administrator Wright was working on corrective action with regard to well-being checks to ensure timely completion and improved accuracy. (*Id.*)

Also, Croucher expressed concerns about Todd County's medical protocol, stating, "There is also a concern in regard to medical protocol in regard to inmates showing signs and symptoms of chemical withdrawal." (*Id*.) He "strongly recommended" that the jail implement an expanded chemical withdrawal questionnaire and flowsheet, with input from the facility's medical authority and nurse. (*Id*.)

### E.    Additional Medical Background

#### 1.    Earlier Medical History

Prior to the events at issue here, Erickson had a long history of alcoholism. (Umsted Decl., Ex. R (Fowlkes Report) at 2; *id.*, Ex. P (Keller Report) at 8.) In 2002, he was

30

hospitalized for alcohol withdrawal, with medical notes documenting "status epilepticus," and a discharge diagnosis stating "delirium tremors (sic)." (Fowlkes Report at 2, 4.) After a period of sobriety from approximately 2005 to 2013, Erickson resumed drinking. (*Id.* at 3, 5.)

In April 2017, a few weeks before Erickson's death, he was diagnosed with "acute alcohol dependence syndrome" at the Stevens Community Medical Center in Starbuck, Minnesota. (Umsted Decl., Ex. 88 (Stevens Comm. Med. Ctr. Records) at TESCM16.) On April 14, 2017, his treating provider, Nurse Practitioner Kayla Bowers, conducted a physical exam and noted Erickson's interest in admission to the Stevens Community Medical Center for "medical detox." (*Id.*) She referred Erickson to the center's emergency room for assessment and admission, and further noted, "Discussed with patient that he may need to go to a facility such as Fergas for Detox treatment, depending on availability. Discussed with patient that before we can adjust his medication for depression, we need to have him get through acute withdrawal. Patient in agreement with plan." (*Id.*)

Erickson was transferred to the Central Minnesota Mental Health Center for detox treatment at approximately 7:00 p.m. that evening. (Fowlkes Report at 6.) His admission paperwork was "deferred until sober" and the following day, he requested permission to visit an emergency department. (*Id.* at 6–7.)

Medical records from April 15, 2017 show that Erickson treated with Dr. Andrew Schippel in CentraCare's emergency room in St. Cloud, Minnesota "for evaluation from detox with nausea and vomiting." (Umsted Decl., Ex. 68 (CentraCare Records) at CC-1088.) Dr. Schippel's notes state that Erickson had been "transferred to detox here in St.

31

Cloud" since the previous evening, had experienced episodes of vomiting and anxiety "as he is starting to withdraw." (*Id*. at CC-1088–89.) His withdrawal symptoms, initially described as "mild to moderate," included a mild headache, pins and needles, "somewhat of a shake," a "mild tremor," and nausea. (*Id*. at CC-1089.) In addition, the records note, "He has not had any withdrawal seizures in the past." (*Id*.) Over the course of his visit, staff assigned Erickson an alcohol withdrawal score of 16, and observed that his tremors became "more severe" and "significant," his headache progressed from mild to moderate, and he experienced "some mild sweats." (*Id*. at CC-1089–90.) Emergency room staff administered "titrating doses" of Ativan (Lorazepam) and potassium. (*Id*. at 1090.) The records reflect that Erickson was reluctant to return to detox," but was cooperative and agreed to do so. (*Id*. at CC-1090-91.)

Erickson treated with Bowers again on April 17, 2017, in which she noted that Erickson had been released from detox treatment on April 16, 2017, and was inquiring about switching his medication for depression. (Stevens Comm. Med. Ctr. Records at TESCM12.) Under "additional reasons for visit," Bowers listed "alcohol abuse," and noted that Erickson also inquired about being prescribed potassium, magnesium, and thiamine to treat his alcohol abuse. (*Id*.)

### 2.    Contacts with CentraCare Staff on May 6 and 7, 2017

As noted, during Erickson's detention at the Todd County Jail, officers contacted CentraCare three times. First, Kloos called Sticha at 4:34 p.m. on May 6 to discuss Erickson's medications. (Kloos Dep. at 41; Sticha Dep. at 80.) Second, Erickson's jail file indicates that Spanswick called Nimmo at 12:44 a.m. on May 7 "regarding seizure

activity," (Todd Cnty. Jail File at P/T 52), and/or to discuss "seizure medications." (Chart Notes at CC-46.) Finally, Kloos contacted Sticha at 12:19 p.m. on May 7 "for advice on DTs." (*Id*. at P/T 51.)

In CentraCare's Rule 30(b)(6) deposition, its corporate designee, Jodi Hillmer, testified that the information Todd County officers had reported to CentraCare's medical staff was sufficient to alert CentraCare that Erickson was potentially at risk for alcohol withdrawal. (Umsted Decl., Ex. G (CentraCare Dep.) at 222–23.) While Hillmer stated that the information was sufficient to alert staff to the potential *risk* for alcohol withdrawal, she stated "it wasn't reported that [Erickson] was *having* any symptoms of alcohol withdrawal." (*Id*.) (emphasis added).

CentraCare has implemented protocols for appropriate standards of care for various medical conditions. (Umsted Decl., Ex. 145 (CentraCare's Answers to Second Req. for Adm.) at Nos. 56–57); *id.*, Ex. 22 (CentraCare's Answers to First Req. for Adm.) at Nos. 6–9, 11.) With respect to a person's risk of alcohol withdrawal, CentraCare providers are instructed to take the following actions: (1) measure vital signs, assess symptoms, assign a score, and administer Lorazepam or another benzodiazepine based on the score, (Umsted Decl., Ex. 119 (CentraCare Alcohol Withdrawal Flowsheet) at CC 184-86); (2) obtain a history of drinking patterns and prior alcohol withdrawals, (Umsted Decl., Ex. 121 (CentraCare Withdrawal Protocols) at CC 184–85); (3) enlist the aid of a "friend or family member," (Umsted Decl., Ex. 115 (CentraCare Alcohol-Related Protocols) at CC 48); and (4) initiate an "individualized" care plan. (*Id*. ("Care plan . . . must be individualized.");

*id.* at CC 49 ("Client will receive care based on documented assessment of their needs, interventions and outcomes.").)

CentraCare acknowledges that its standard-of-care protocols apply to everyone, including jail inmates. (CentraCare Dep. at 136, 151; CentraCare's Answers to First Req. for Adm. at No. 10.) Similarly, Sticha, Nimmo, and Hock testified that inmates are to be treated the same as any patients. (Sticha Dep. at 77; Nimmo Dep. at 52; Umsted Decl., Ex. N (Hock Dep.) at 167.) Moreover, CentraCare acknowledges that its providers are obliged to provide the "best advice" to anyone, regardless of whether the person presents for treatment in person or over the phone. (CentraCare Dep. at 156.)

### a. Sticha

As noted earlier, at approximately 4:34 p.m. on May 6, Officer Kloos spoke with Sticha about Erickson's medications, including the purpose for which they were prescribed. (Kloos Dep. at 41; Sticha Dep. at 80.) When deposed, Sticha could not recall this conversation. (Sticha Dep. at 85.) Sticha did not document either call with Kloos, and could not explain why she had not done so. (*Id*. at 85–86.)

Sticha testified to her general awareness of the substance of CentraCare's alcohol withdrawal protocol, however. For instance, she knew that patients with alcohol dependence who abruptly abstain from alcohol use are at risk of developing alcohol withdrawal syndrome. (*Id*. at 19–20.) She also knew, as of May 6, 2017, that alcohol withdrawal syndrome can be fatal if not assessed and treated, particularly in its early stages. (*Id*. at 25.) In addition, Sticha testified that treatment plans for withdrawal must be individualized, based on the patient's medical history, vital signs, and subjective

symptoms. (*Id*. at 34.) She further knew that a patient's history of prior withdrawal episodes was among the risk factors for withdrawal. (*Id*. at 35–36.) In addition, Sticha testified to her awareness that withdrawal symptoms are likely to appear within six to 24 hours after the person's last drink. (*Id*. at 20–21, 33.) She further knew that symptoms of alcohol withdrawal could be managed with benzodiazepine medication, such as Lorazepam. (*Id*. at 27, 39.) Finally, Sticha testified that she understood, as of May 6, 2017, that the standard of care for treating people at risk of alcohol withdrawal required: (1) asking for a patient's medical history, including the pattern of alcohol use, history of withdrawal symptoms, and reasons for cessation; (2) performing a physical exam, to include vital signs, mental status, signs of tremors, etc.; (3) performing a scored assessment; (4) administering benzodiazepine medication; and (5) closely monitoring and reassessing the patient's condition. (*Id*. at 27–28, 40–41, 56–59.)

Sticha stated that if she were advised of concerns about an inmate with DTs, her standard practice would be to ask for vitals (blood pressure, temperature, and pulse), symptoms, and allergies, and then relay the information to the emergency room physician or provider and devise a plan of care. (*Id*. at 87–89.) She testified that she would take such action based on her awareness that alcohol withdrawal is serious, can be fatal, and must be assessed and treated properly and quickly. (*Id*. at 88–89.) Sticha could think of no reason why she would have departed from this standard practice with respect to Erickson, and acknowledged that she could not recall asking for Erickson's vital signs, symptoms, allergies, or contacting the ER provider about him. (*Id*. at 89.) Sticha conceded that a nurse who received a report from a corrections officer with concerns about an inmate's

DTs or alcohol withdrawal symptoms, but who failed to obtain vital signs, symptoms, and contact an emergency room provider, would fall below the standard of care. (*Id*. at 92.)

### b.   Nimmo

Erickson's CentraCare records indicate that at approximately 12:44 a.m. on May 7, Spanswick phoned Nimmo, apparently prompted by Erickson's question about his "seizure medication." (Chart Notes at CC-46.) As noted earlier, Spanswick indicated in the jail's call log that she phoned the nurse regarding "inmate seizure activity." (Todd Cnty. Jail File at P/T 52.)

Spanswick reviewed Erickson's medications with Nimmo, including Antabuse and Amlodipine, and informed her that his BAC had dropped to 0.12 at 12:30 a.m. (Chart Notes at CC-46.)

Nimmo could not independently remember her conversation with Spanswick, (Nimmo Dep. at 58, 80–81), but testified to her general awareness that alcohol withdrawal can be fatal and that an additional risk factor for withdrawal is high blood pressure. (*Id*. at 62–63.) Nimmo agreed that assessing a patient's risk of alcohol withdrawal is vital because it can be fatal. (*Id*. at 24.) She testified that the standard protocol to assess a patient's risk of complications from alcohol withdrawal involves an assessment scale. (*Id*.) Nimmo noted that a patient's score on the assessment scale determines the dosage and frequency of medication, if ordered by a physician, and patients must be reassessed at certain intervals, depending on their score. (*Id*. at 25–26, 29.) In addition, Nimmo stated that the assessment must be performed in person. (*Id*. at 69.)

Nimmo could not remember why she did not ask to see Erickson in person. (*Id.* at 70.) She also acknowledged that she had not accessed Erickson's medical records to determine whether he had previously experienced complications from alcohol withdrawal, even though such information would have been relevant, and she could have done so. (*Id.* at 76–78.) Based on her knowledge of Erickson's potentially life-threatening condition, she acknowledged that she was obliged to "do something about it" or raise her concerns with someone else. (*Id.* at 75–76.) She stated that she fulfilled her obligation by talking to PA Hock. (*Id.*)

### c.   Hock

Nimmo relayed Erickson's information to Hock, including his medications, BAC levels, alcoholism and hypertension, cessation of alcohol, and his request for "seizure medication." (Chart Notes at CC-46; *id.*, Ex. 145 (CentraCare's Answers to Second Req. for Admissions) at Nos. 37–44.)

In his deposition, Hock agreed that he knew as of May 6, 2017, that proper management of alcohol withdrawal syndrome requires identifying the condition, and assessing the patient's risk of complications. (Hock Dep. at 20–21.) He was aware that when alcohol is consumed in large quantities for more than two weeks and then abruptly discontinued, withdrawal symptoms are likely to occur. (*Id.* at 22.) In addition, Hock knew that alcohol withdrawal could be fatal, and that complications were less risky if alcohol withdrawal is identified early. (*Id.* at 166–67.) Hock was also aware that hypertension is a risk factor for complications from alcohol withdrawal, and that symptoms

of alcohol withdrawal syndrome begin six to 24 hours after the last consumption of alcohol. (*Id*. at 21, 71.)

Hock testified that in his practice, he treats patients at risk of alcohol withdrawal by assessing them, monitoring them, and "supporting [them]." (*Id*. at 34) (discussing his approach to treating alcohol withdrawal when an acutely intoxicated patient presents for care). His care includes regular monitoring of the patient's vital signs, and consideration of the patient's history, prior withdrawal episodes, comorbidities, age, "seizures during the current withdrawal," and whether the patient is "psychologically dependent." (*Id*. at 49, 69–70.) As of May 6, 2017, Hock knew that Lorazepam was a benzodiazepine medication for treating alcohol withdrawal and that benzodiazepines could be administered prophylactically to asymptomatic or minimally symptomatic patients at risk for alcohol withdrawal syndrome. (*Id*. at 105.)

Hock advised Nimmo that he found it appropriate to withhold all of Erickson's medications until his BAC was lower, but acknowledged that he never reviewed Erickson's chart, did not examine or talk to him, did not take his vitals, and did not inquire as to prior withdrawal episodes, DTs, or seizures. (*Id*. at 125–27.) Hock could not recall why he did not ask Nimmo or Spanswick to obtain Erickson's vital signs and relay the information to him. (*Id*. at 157–60.) He testified that if Erickson had presented in person at CentraCare, he would have "certainly done a risk assessment," which he agreed is the standard of care. (*Id*. at 161–63.)

II.    **DISCUSSION**

    A.    **Summary Judgment**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When analyzing qualified immunity at summary judgment, the court should not "deny summary judgment any time a material issue of fact remains on the [constitutional violation] claim [because to do so] could undermine the goal of qualified immunity to avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *O'Neil v. City of Iowa City*, 496 F.3d 915, 917 (8th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (internal quotation marks omitted) (alterations in original)). Instead, "the court must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe [them].'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) (alterations in original)).

Although the moving party bears the burden of establishing the lack of a genuine factual dispute, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Krenik v.*

*Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### B.   Deliberate Indifference Under 42 U.S.C. § 1983 (Count 1)

As noted earlier, County Defendants McCallum, Kloos, Spanswick, Mattson, and Wright seek summary judgment on the basis of qualified immunity for Plaintiffs' deliberate indifference claim under 42 U.S.C. § 1983 (Count 1). CentraCare Defendants Sticha, Nimmo, and Hock contend that they are entitled to summary judgment because Plaintiffs cannot establish deliberate indifference. For their part, Plaintiffs oppose Defendants' motions, and affirmatively seek summary judgment on their § 1983 claim as to Wright, Kloos, Spanswick, Sticha, Nimmo, and Hock.

#### 1.   Qualified Immunity

Qualified immunity protects government officers from § 1983 liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). Thus, the Court must perform a two-part analysis to determine if qualified immunity applies: (1) decide whether the facts show the violation of a constitutional or statutory right, and (2) determine whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier*, 533 U.S. at 194). The Court may analyze either step first. *Id.* at 236. Qualified immunity

"is an *immunity from suit* rather than a mere defense to liability . . . [and] it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity is a question of law for the court to decide. *Littrell v. Franklin*, 388 F.3d 578, 584 (8th Cir. 2004).

### 2. Clearly Established Right

In order for a right to be clearly established, it must be "sufficiently clear" that a reasonable official would understand that his or her conduct violates that right. *Dadd v. Anoka Cnty.*, 827 F.3d 749, 756 (8th Cir. 2016) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Broadly speaking, Plaintiffs assert that County Defendants McCallum, Mattson, Wright, Kloos, and Spanswick violated Erickson's Fourth and Fourteenth Amendment substantive rights through their deliberate indifference to Erickson's serious medical need and failure to provide adequate medical attention.[9]  While claims of inadequate medical care for convicted prisoners are typically analyzed under the Eighth Amendment's prohibition against cruel and unusual punishment, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), similar claims brought by detainees prior to an adjudication of guilt are analyzed under the Fourteenth Amendment's Due Process Clause. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

---

[9] Plaintiffs plead this claim under both the Fourth and Fourteenth Amendments, citing *Bailey v. Feltmann*, 810 F.3d 589, 592–93 (8th Cir. 2016) (recognizing uncertainty as to whether arrestees' claim for denial of medical care arises under the Fourth Amendment or Fourteenth Amendment, but finding that right was clearly established under the Fourteenth Amendment at the relevant time period, but not under the Fourth Amendment). (Second Am. Compl. at 26 n.1.)

In determining whether the rights at issue here were clearly established as of the relevant time, the Eighth Circuit takes a "broad view" of the sources of clearly established law and permits courts to consider "all available decisional law, including decisions of state courts, other circuits and district courts." *Buckley v. Rogerson*, 133 F.3d 1125, 1129 (8th Cir. 1998). Even so, it has stated that a plaintiff must "identify[] controlling precedent with a close correspondence to the particulars of the present case." *Rusness v. Becker Cnty.*, 31 F.4th 606, 615 (8th Cir. 2022) (citing *Anderson*, 483 U.S. at 639–41; *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "This means that the right in question must be construed fairly narrowly and that facts in the present case must align with facts in precedent," requiring courts to "close[ly] examin[e] [] the facts to determine what right is at issue and thus whether qualified immunity is appropriate." *Id*. (citing *Ivey v. Audrain Cnty.*, 968 F.3d 845, 849–51 (8th Cir. 2020)). The Supreme Court has stated, "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Johnson v. Carroll*, 658 F.3d 819, 828 (8th Cir. 2011) ("Although earlier cases need not involve fundamentally or materially similar facts, the earlier cases must give officials fair warning that their alleged treatment of the plaintiff was unconstitutional.").

Plaintiffs point to the general, clearly established right of a pretrial detainee to be free from deliberately indifferent denials of medical care. (Pls.' Mem. [Doc. No. 87] at 59.[10]) And more specifically, Plaintiffs identify the following rights as clearly established:

---

[10] When citing to the parties' memoranda, citations to "[Party's] Mem." refer to that party's affirmative summary judgment memorandum, and citations to "[Party's] Reply"

(1) the right of a detainee displaying symptoms of extreme intoxication to medical assistance for a serious medical need; and (2) the right of a detainee to receive prescribed medication.  (Second Am. Compl. ¶ 110; Pls.' Mem. at 59–60; 79.)

Indeed, the Eighth Circuit has held it was "clearly established by 2008 that a pretrial detainee has a due process right to be free from deliberately indifferent denials of emergency medical care."  *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017) (citing *Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016)).  The court has also held that, as of 2011, "a reasonable officer . . . would have recognized that failing to seek medical care for an intoxicated arrestee who exhibits symptoms substantially more severe than ordinary intoxication violates the arrestee's constitutional rights, all the more so when the surrounding circumstances indicate that a medical emergency exists."  *Barton v. Taber*, 820 F.3d 958, 967 (8th Cir. 2016) ("*Barton I*").

With respect to out-of-circuit authority, in *Stefan v. Olson*, 497 Fed. App'x. 568, 579–80 (6th Cir. 2012), the Sixth Circuit found it clearly established that pretrial detainees are constitutionally entitled to protection from known substantial risks, which include the right to medical care, and that this precedent applied to a detoxifying inmate, who was at high risk for seizures, and was placed in a concrete and cinder-block cell without appropriate medical precautions, regardless of the fact that he not yet manifested the most pronounced signs of withdrawal. The Eleventh Circuit has also identified clearly

---

refer to their affirmative summary judgment reply.  Citations to "[Party's] Opp'n" refer to that party's memorandum in opposition to another party's summary judgment motion.

established precedent for the proposition that "a sheriff and his jail officials acted with deliberate indifference by refusing to obtain medical treatment for a chronic alcoholic suffering from withdrawal," and for the proposition that "a jail official who is aware of but ignores the dangers of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care is deliberately indifferent to the inmate's constitutional rights." *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1426 (11th Cir. 1997) (citations omitted), *overruled in part on other grounds by LeFrere v. Quezada*, 588 F.3d 1317 (11th Cir. 2009).

As a general matter, these rights were clearly established as of May 6 and 7, 2017, however, the Court will address, *infra* at II.B.4, whether this precedent applies "to the situation that the officers faced here." *Ivey*, 968 F.3d at 849 (assuming that the broadly defined right to medical assistance was clearly established as a "general matter," it must be applied to the situation that the officers faced).

Regarding the right to medication, the Supreme Court has recognized that the constitutional obligation to provide medical care to detainees may be violated when officials "intentionally deny or delay access to medical care or intentionally interfere with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (cleaned up); *see also Dadd*, 827 F.3d at 757 (noting that right of detainee who arrived at jail with prescription medication to receive such medication was clearly established); *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006) (stating that "the knowing failure to administer prescribed medicine can itself constitute deliberate indifference."). As with the rights discussed in the preceding paragraph, the Court finds that in general, the right of a detainee to receive medication as prescribed was clearly established as of May 6 and 7, 2017, but

again, the Court proceeds to determine, *infra* at II.B.4, whether this precedent applies to the situations that the Individual Defendants faced.  *Ivey*, 968 F.3d at 849.

### 3.    Alleged Violations of the Fourth and Fourteenth Amendments

Turning to the other half of the qualified immunity analysis—whether the facts show the violation of a constitutional right—a plaintiff asserting a deliberate indifference claim must show (1) that he "suffered from an objectively serious medical need," and (2) that one or more defendants "had actual knowledge of that need but deliberately disregarded it."  *Ryan*, 850 F.3d at 425 (quoting *Bailey*, 810 F.3d at 593–94).

The first prong of the deliberate indifference analysis is an objective inquiry, and is satisfied if the detainee's medical need "is supported by medical evidence, such as a physician's diagnosis, or is 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'"  *Id.* (quoting *Bailey*, 810 F.3d at 594).  The second prong is a subjective inquiry, and imposes "an extremely high standard that requires a mental state of 'more . . . than gross negligence.'"  *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016), *as amended* (Mar. 4, 2016) (quoting *Fourte v. Faulkner Cnty.*, 746 F.3d 384, 387 (8th Cir. 2014)).  This standard is satisfied only by a showing of "a mental state akin to criminal recklessness"; neither "negligence nor gross negligence are sufficient." *Ryan*, 850 F.3d at 425 (citing *Thompson v. King*, 730 F.3d 742, 746–47 (8th Cir. 2018).  A plaintiff may prove the defendant's mental state "through circumstantial evidence, as 'a factfinder may determine that a defendant was actually aware of a serious medical need but deliberately disregarded it, from the very fact that the [medical need] was obvious.'" *Id.* (quoting *Vaughn v. Gray*, 557 F.3d 904, 908–09 (8th Cir. 2009)) (alteration in original).

45

Because liability for damages for a federal constitutional tort is personal, "each defendant's conduct must be independently assessed." *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006).

### 4.   Objectively Serious Medical Need

An objectively serious medical need may be established if it was either "supported by medical evidence, such as a physician's diagnosis," or was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Ryan*, 850 F.3d at 425. Plaintiffs assert that Erickson's alcoholism and related alcohol withdrawal were objectively serious medical needs. (*See* Pls.' Mem. at 60–62.)

The Todd County Individual Defendants argue that Erickson did not have an objectively serious medical need when he was arrested or booked into jail, (Cnty. Defs.' Mem. [Doc. No. 73] at 20), and the CentraCare Individual Defendants further maintain that there was no diagnosis of a medical need, nor was Erickson's need so obvious that even a layperson would have recognized the necessity of medical attention. (CentraCare's Mem. [Doc. No. 81] at 12.)

As to a medical diagnosis of Erickson's serious medical need, *Ryan*, 850 F.3d at 425, the medical records diagnose acute alcohol dependence and alcoholism, and document incidents of alcohol withdrawal in the recent past. They do not contain a contemporaneous diagnosis of alcohol withdrawal syndrome, however. This is not surprising, since Erickson was not allowed to present for treatment for alcohol withdrawal or receive a diagnosis of alcohol withdrawal on May 6 or 7, 2017.

46

Turning to whether Erickson's medical need was so obvious that even a layperson would have recognized the need for medical attention, *id.*, the Eighth Circuit has made clear that "an officer does not lose the protections of qualified immunity merely because he does not react to all symptoms that accompany intoxication." *Thompson*, 730 F.3d at 748. For example, in *Grayson v. Ross*, the Eighth Circuit found that an intoxicated arrestee did not present an objectively serious medical need, despite clear methamphetamine intoxication. 454 F.3d 802 (8th Cir. 2006). The court reasoned: "Confronted with a calm, non-combative person sitting on a bench answering questions, a layperson would not leap to the conclusion that Grayson needed medical attention, even if he were aware that Grayson had taken methamphetamine." *Id.* at 810.

By contrast, the Eighth Circuit has found an objectively serious medical need where an intoxicated arrestee "could not answer questions and could not remain seated without falling over." *Barton I*, 820 F.3d at 965. In *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) ("*Barton II*"), the Eighth Circuit affirmed the denial of qualified immunity, and pointed to certain facts, some of which are present here, from which a jury could find that the arrestee was experiencing a medical need so obvious that even a layperson could recognize it:

> As recounted above, Barton had been in a car accident. He could not follow simple instructions or answer basic questions; he was unable to stand without assistance and fell during the booking procedure. Although Barton had a .115 blood alcohol concentration, he reportedly was so heavily intoxicated that Wright could not recall whether he had "ever r[u]n into somebody that was in [Barton's] particular shape," and he "d[id]n't know that any of [his] officers had either." In light of the evidence of Barton's recent car accident, his severe intoxication, and his drug ingestion, we conclude that a jury could

47

> find that Barton was experiencing a medical need so obvious that a layperson
> would recognize that he needed prompt medical attention.

908 F.3d at 1124.  Plaintiffs highlight the fact that after his arrest for DUI with a BAC level

of over 0.327—over four times the legal limit—Erickson arrived at the Todd County Jail

so unresponsive that officers delayed his booking and medical screening for many hours.

And as for Erickson's level of intoxication compared to other detainees, Kloos testified

that he "was more aware of [Erickson's risk for alcohol withdrawals] than I would be with

some other lesser intoxicated individuals."  (Kloos Dep. at 82–83.)

The Court finds that disputed issues of material fact remain as to whether his

medical need was "so obvious that even a layperson would easily recognize the necessity

for a doctor's attention."  *Ryan*, 850 F.3d at 425.  When Erickson was in Pope County's

custody, he was able to converse with officers, McCallum described his booking procedure

as routine, and he ate a meal in the back of a squad car during his transport to the Todd

County Jail.  Similarly, while in Todd County's custody, at various points, he was able to

converse with officers, walk between his cell and the booking area, use the bathroom, and

eat.  From this evidence, a layperson would likely not recognize that Erickson required

medical attention.

However, the record also contains compelling contrary evidence.  When Pope

County initially took Erickson into custody for DUI at 9:00 a.m. on May 6, 2017, he

exhibited signs of extreme intoxication and registered a 0.327 BAC.  Pope County officers

relayed Erickson's BAC level to Todd County officers.  Plaintiffs point to the following

facts that suggest a serious medical need when Erickson was in Todd County's custody:

(1) Erickson was too intoxicated to be booked into jail for many hours; (2) at various points, he was incoherent and unresponsive when addressed, making it unclear whether he was even breathing; (3) he reported a history of seizures; (4) the Todd County Jail File noted "seizure activity"; (5) Erickson stated that he was "sicker now" and asked for his medications; (6) he reported that he had been shaking; (7) he complained about the cold temperature and asked for additional blankets; and (8) he emitted noises such as groans that were audible beyond his cell.

The facts that the Individual County Defendants highlight are similar to *Grayson*, in which the detainee sat calmly and answered questions during booking, 454 F.3d at 810, and *Kelley v. Correctional Officer Pulford*, No. 18-cv-2805 (SRN/TNL), 2020 WL 6064577, at *9 (D. Minn. Oct. 14, 2020), in which the detainee was able to communicate coherently, even though he appeared intoxicated, and was cooperative, and able to walk unassisted.  But Plaintiffs identify facts that are much more like *Thompson*, in which the detainee passed out in the booking area and was unable to answer questions.  730 F.3d at 749.

Ultimately, at various points while Erickson was in the County Defendants' custody, his conduct was similar to the detainee in *Grayson* or *Kelley*, and at other times, his conduct was similar to the detainee in *Thompson* and *Barton II*.

The CentraCare Defendants urge the Court to rely on video evidence showing that when Erickson took his medications at 12:23 p.m. on May 7, he was not exhibiting any obvious signs of an objectively serious medical need.  (CentraCare's Mem. at 12) (citing *Scott*, 550 U.S. at 380) ("When opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). But the record here—including the video record—does not "blatantly contradict" Plaintiffs' facts. As reflected in the jail video, while Erickson took his medications and spoke with Kloos at 12:23 p.m., he also referred to the fact that he had been "shaking" and used both hands to drink from his cup of water. Moreover, approximately 20 minutes earlier, Erickson reported that he felt "sicker now." In addition, jail cell video beginning around 5:00 p.m.—unfortunately, the earliest time for which there is existing cell video—shows Erickson groaning, continuously exhaling, tossing and turning in his bed, curling into a ball, attempting to cover himself with blankets from head to toe, and possibly hallucinating. Between 5:17 and 5:18, Erickson emitted an extremely loud snore or groan and fell to the floor, where his legs made jerking movements, and he emitted snorting sounds from his throat. Sobiech only found Erickson at 5:21 p.m. and began providing medical care at that time.

In light of this record, the Court finds that a genuine dispute of material fact exists as to whether Erickson was experiencing a medical need so obvious that even a layperson would have recognized that he required medical attention prior to 5:21 p.m. on May 7, 2017. *See Barton II*, 908 F.3d at 1124 ("In light of the evidence of Barton's recent car accident, his severe intoxication, and his drug ingestion, we conclude that a jury could find that Barton was experiencing a medical need so obvious that a layperson would recognize that he needed prompt medical attention.").

50

5.    **Individual Defendants' Actual Knowledge and Deliberate Disregard for Erickson's Serious Medical Need**

The Individual Defendants also argue that none of them actually knew of Erickson's serious medical need and deliberately disregarded it. Because this prong of the analysis requires an independent assessment of each defendant's conduct, the Court will discuss them individually. *See Wilson*, 441 F.3d at 591. And, as noted earlier, for purposes of qualified immunity analysis, the Court will also address whether the constitutional rights in question were clearly established as of May 2017, within the specific context of the situations that each of the Individual Officers confronted. *See Rusness*, 31 F.4th at 615.

a.    **Deputy McCallum**

McCallum argues that because she believed that Erickson was merely intoxicated, as opposed to dangerously intoxicated, she was not deliberately indifferent, and is therefore entitled to qualified immunity. (*See* Cnty. Defs.' Mem. at 23–24.) Plaintiffs, however, oppose her motion and contend there is sufficient circumstantial evidence from which a reasonable jury could find that McCallum had subjective knowledge that Erickson required medical attention and deliberately disregarded it. (Pls.' Opp'n [Doc. No. 100] at 34–37.)

When evaluating an officer's subjective knowledge, courts have distinguished between instances in which the arrestee displays signs of mere intoxication, and instances in which the arrestee displays signs of dangerous intoxication for which medical attention is required. *See Barton II*, 908 F.3d at 1124–25 (discussing *Grayson*, 454 F.3d at 802, and *Thompson*, 730 F.3d at 742). Facts relevant to this determination include whether the arrestee is able to follow simple instructions and answer basic questions, or whether he or

51

she "exhibits symptoms substantially more severe than ordinary intoxication." *Id*. at 1124–25 (quoting *Barton I*, 820 F.3d at 967).

The facts here demonstrate that while McCallum knew that Erickson displayed signs of intoxication, she did not know that he displayed signs of dangerous intoxication that required medical attention. At the outset of her roadside interaction with him at approximately 9:00 a.m. on May 16, McCallum observed that Erickson had difficulty standing upright, balancing, and could not follow her commands for the HGN test. (McCallum Dep. at 25–29.) Erickson acknowledged that he had consumed "a couple" of alcoholic drinks that morning. (*Id*. at 23.) When McCallum administered a BAC test, Erickson registered an extraordinarily high result of 0.327 BAC on a "weak" sample that likely underreported his actual level of intoxication. (*Id*. at 29.)

However, upon taking Erickson into custody, McCallum described him as "an average drunk" who was cooperative and able to understand forms, sign them, and coherently communicate with her. (*Id*. at 34–38.) She characterized their interaction as "a typical DUI process," which is usually 45 minutes to an hour long. (*Id*. at 34–36.) McCallum stated that dispatchers likely informed her of the number of Erickson's prior DUIs. (*Id*. at 36–37.) She testified that she saw no reason to assess Erickson for the risk of alcohol withdrawal because he exhibited no symptoms such as shaking, perspiring, seizures, confusion, and unresponsiveness. (*Id*. at 45, 47.) McCallum also testified that her knowledge of Erickson's use of alcohol was limited to May 6, 2017, and she did not form a belief as to whether Erickson was an alcoholic. (*Id*. at 49–50.) In addition, McCallum stated that she had no knowledge of the procedures or treatment for a person at

risk of alcohol withdrawal.  (*Id.* at 46.)  McCallum had past experience sending arrestees to detox centers, however, stating that she has done so when they are "incoherent, unresponsive, not able to form sentences or communicate with me, not able to sign forms." (*Id.* at 54–56.)

By and large, these facts are similar to *Grayson*, 454 F.3d at 806–09, in which the court granted qualified immunity to the arresting officer.  In *Grayson*, the arrestee initially acted irrationally, then became combative, requiring the officer to subdue him, but shortly thereafter became calm, followed commands, answered questions, and remained seated on a bench.  Although Erickson did not become combative at any point, he initially presented with difficulty walking and following directions, and shortly thereafter answered questions and communicated coherently.

In addition, in *Grayson*, "[a]lthough the arresting officer likely knew the detainee was under the influence of methamphetamine," the court found he lacked subjective knowledge of a serious medical need because he "was unsure whether [the detainee] was hallucinating." *Id.* at 809.  McCallum testified that although Erickson was intoxicated, she did not believe he had a serious medical need based on his coherent, cooperative behavior and the fact that he exhibited no signs of alcohol withdrawal.

Plaintiffs, however, note Cindy Klatt's testimony that she told McCallum about Erickson's fear of dying in a jail from alcohol withdrawal—a conversation that McCallum disputes.  But even viewing Klatt's testimony in the light most favorable to Plaintiffs, given all of the other evidence noted above, the Court finds that no reasonable jury could conclude that Klatt's information establishes McCallum's subjective knowledge of a

serious medical need or creates a fact issue. McCallum's subjective knowledge was informed by her direct observations of Erickson's then-current condition. Nor did she retain custody of Erickson as his condition progressed. Given these facts, her conduct in not seeking medical care does not rise to the level of criminal recklessness.

Finally, for purposes of qualified immunity, even if Erickson's constitutional rights were clearly established as of May 2017, i.e., the rights of a detainee to emergency medical care and prescribed medication, and the right of a severely intoxicated detainee to medical care, the facts relevant to McCollum fail to show the violation of these rights, as the Court has discussed above. *Barton I*, 820 F.3d at 966 (noting that the clearly-established-law inquiry regarding the denial of medical care is context-specific).

In sum, the Court finds that McCallum is entitled to summary judgment based on qualified immunity and her motion is granted.

### b. Corrections Officer Kloos

Kloos seeks summary judgment based on qualified immunity for Plaintiffs' deliberate indifference claim, and Plaintiffs move for summary judgment against him. The Court finds that disputed issues of material fact preclude granting summary judgment to Kloos based on qualified immunity or granting Plaintiffs summary judgment as to this claim.

Similar to McCallum, Kloos relies on the following authority: (1) *Thompson*, 730 F.3d at 748, in which the court held that "[a]n officer does not lose the protections of qualified immunity merely because he does not react to all symptoms that accompany intoxication"; (2) *Grayson*, 454 F.3d at 810, in which a booking officer was entitled to

qualified immunity where he knew the arrestee was likely under the influence of methamphetamine, but the arrestee was compliant and coherent in response to routine questions; and (3) *Kelley*, 2020 WL 6064577, at \*4–5, in which the detainee was "not going unconscious," was "giving coherent answers to questions," and was capable of completing the booking process prior to being placed in a holding cell.

But the evidence in the record here demonstrates that a reasonable juror could find that Kloos violated Erickson's clearly established constitutional rights. As to subjective knowledge of a serious medical need, Kloos found that Erickson had a high level of intoxication, but not a high level of impairment. He did not consider Erickson a "special needs" inmate despite his high level of intoxication, testifying that he did not see Erickson display any signs of alcohol withdrawal. (Kloos Dep. at 141.) Nonetheless, Kloos deemed Erickson too intoxicated to go through the booking process at any point during his shift on May 6, 2017. (Defs.' Answers to First Interrogs. at No. 14; Kloos Dep. at 129, 139.) Kloos acknowledged that this meant he was unable to effectively medically screen Erickson within two hours of Erickson's arrival at the jail, (Kloos Dep. at 129), as jail policy required. (Todd Cnty. Jail Policies at P/T 3714–15.) When asked whether an inmate who is too intoxicated to provide emergent medical information within two hours of arrival should be in jail without medical supervision, Kloos testified, "I don't even know how to answer that question." (Kloos Dep. at 129–30.) Kloos could recall "a couple" of instances in which an inmate's booking process had been delayed by as much as five hours due to their level of intoxication, but was unaware of any booking delays of up to ten hours, other than with Erickson. (*Id*. at 148.)

55

In addition, through information that Sticha communicated in a May 6 phone call regarding Erickson's medications, Kloos suspected that Erickson was an alcoholic. (*Id*. at 41–43.) He had also reviewed the driver's license database which showed that Erickson had a long history of alcohol-related offenses. (Todd Cnty. Jail File at P/T 37–38.) Moreover, Kloos testified to his awareness that Erickson was at "very high risk" of alcohol withdrawal. (Kloos Dep. at 71–72.)

Although Sticha advised Kloos to administer Erickson's medications on their prescribed schedules, Kloos disregarded her direction and followed the policy of Todd County and CentraCare to withhold medication until the inmate's BAC reached 0.00. (Kloos Dep. at 59–60, 69–70; *see also* Sticha Dep. at 80.) Plaintiffs assert that when an official denies "treatment that has been ordered or medication that has been prescribed, constitutional liability may follow." (Pls.' Opp'n at 87) (citing *Dadd*, 827 F.3d at 757). By the end of Kloos' shift at 6:00 p.m. on May 6, Erickson had not been booked, medically screened, or given any of his medications.

The following day, Kloos reported to work and could hear Erickson snoring. At approximately 12:11 p.m., he dispensed Erickson's medications. Indeed, Erickson was able to walk from his cell to the booking desk for a BAC test and for his medications, but Erickson referred to the fact that he had been "shaking" and repeatedly rubbed his hand across his head and face, suggesting that he might be sweating—symptoms of alcohol withdrawal of which Kloos was aware. Erickson also told Kloos at least twice that the jail was "cold as hell," prompting Kloos to provide extra blankets. Kloos testified to his

awareness that sweating and difficulty staying warm were symptoms of alcohol withdrawal.  (Kloos Dep. at 94, 141.)

Kloos also logged an entry in Erickson's jail file at 12:19 p.m. on May 7, stating "called nurse for advice on DTs."  (Todd Cnty. Jail File at P/T 51.)  Plaintiffs contend that this reference to "DTs" is circumstantial evidence of Kloos' awareness that Erickson was going through alcohol withdrawal, and possibly specific awareness that Erickson was experiencing DTs.  Kloos testified to his understanding that DTs were "the severe alcohol withdrawal symptoms," and that he was more aware of alcohol withdrawal with Erickson than with "other less intoxicated individuals."  (Kloos Dep. at 82–83.)  Further, he testified that he called Sticha due to a "slight concern that possibly [Erickson] could still develop some alcohol withdrawal symptoms, and to see if she felt that there was anything else, other than the medications for which he had been prescribed, that we should be doing[.]"  (*Id*. at 88.)  On the other hand, he testified that he had no actual concerns when he called Sticha on May 7 and simply sought confirmation that his actions were correct.  (*Id*. at 161.)

With respect to deliberate disregard, again, this state of mind can be inferred "from facts that demonstrate that a medical need was obvious and that the officer's response was 'obviously inadequate.'"  *Barton I*, 820 F.3d at 966 (citing *Thompson*, 730 F.3d at 747).  Kloos testified that Sticha told him to keep an eye on Erickson.  (Kloos Dep. at 93–94) ("[S]he didn't say that the pills that he was currently taking would treat the DTs, but we needed to be watching for any other signs of DTs" and Kloos would watch for  "sweating and tremors . . . and further signs of alcohol withdrawal symptoms.").  Evidence in the record shows that Kloos did not follow her advice.  He admitted that not all of the well-

being checks were performed on the afternoon of May 7. (*Id*. at 99–100 ("[S]omehow physically looking into Mr. Erickson's cell in back got not done for a little bit back there."); *see also* DOC Investig. Report at TEMNDC 4 (identifying missed well-being checks in death investigation report); Umsted Decl., Ex. Q (Reed Report) at 15–17 (identifying missed well-being checks by comparing jail log to surveillance video, and noting that Kloos' checks were only one to two seconds long.).)

Evidence in the record shows that aside from dispensing Erickson's medications, Kloos provided no medical treatment to Erickson until approximately 5:17 p.m. on May 7, when Sobiech found him unresponsive on the floor of his cell. If Kloos subjectively knew that Erickson suffered from a serious medical need based on signs of Erickson's worsening condition and Sticha's direction to monitor Erickson, his failure to provide medical attention and/or closely monitor Erickson could constitute deliberate indifference.

Based on disputed issues of material fact regarding Kloos' subjective knowledge of Erickson's serious medical need and whether he was deliberately indifferent to that need on May 6 and 7, 2017, the Court cannot say, as a matter of law, whether the facts show a violation of a constitutional right. Again, there is evidence that Kloos knew of Erickson's arrest for DUI, knew his highly elevated BAC level, and knew that Erickson was so unresponsive during Kloos' first shift that "[Kloos] did not conduct the healthcare screening that the County's policies require," which could have provided information about Erickson's medications and medical conditions, hours before the screening ultimately occurred. *Barton II*, 908 F.3d at 1125 (noting similar evidence from which a jury could infer the officer's subjective knowledge of a serious medical need). Furthermore, "A jury

also could consider evidence that [Kloos] did not follow the County's policies when [he] decided to accept the obviously intoxicated [Erickson] into the detention center without medical approval and without attempting to refer him to the detoxification unit." *Id.* However, the record contains conflicting evidence regarding Kloos' subjective knowledge. Again, there is evidence in the record showing that during some of Erickson's encounters with Kloos, Erickson was cooperative, responsive to questions, and able to walk under his own power, similar to the detainees in *Thompson*, 730 F.3d at 747–48, and *Grayson*, 454 F.3d at 809.

Having concluded that a jury question exists as to whether Kloos violated Erickson's constitutional rights, the Court turns to the second half of the qualified immunity analysis—whether the rights in question were clearly established at the time. In addressing whether these rights were so clearly established that a reasonable official would have fair warning that his conduct violated them, "[w]e adopt the perspective of a reasonable officer at the scene, taking into account the information he possessed at the time." *Barton I*, 820 F.3d at 966 (citation omitted). As noted earlier, the inquiry regarding the denial of medical care is context-specific. *Id.* ("The appropriate inquiry, then, is whether a reasonable officer in September 2011 would have understood that failing to seek medical care for a post-vehicular accident arrestee who exhibited the symptoms Barton exhibited would violate the arrestee's constitutional rights."). Here, the relevant questions are whether, based on established precedent, a reasonable officer in 2017 would have understood that failing to seek medical care for an extremely intoxicated detainee who exhibited Erickson's symptoms would violate his constitutional rights, and also, whether

failing to timely provide medication, as prescribed and as requested, that the detainee brought to the jail, would violate his constitutional rights. The Court finds that then-existing precedent provided fair warning that such conduct was unconstitutional. *See, e.g., id.* at 967 (addressing right to medical care for severely intoxicated detainee); *see Dadd*, 827 F.3d at 757 (discussing right to medication as prescribed).

As to whether the facts applicable to Kloos align with such precedent, *see Rusness*, 31 F.4th at 615, Kloos encountered a detainee who, for many hours, was so intoxicated he was "unresponsive," similar to the extremely intoxicated detainee whom Officer King encountered in *Thompson*, 730 F.3d at 749, and whom officers encountered in *Barton*, 820 F.3d at 962–63. The booking sheet for the detainee in *Thompson* included the notation "Too Intox To Sign." *Thompson*, 730 F.3d at 749. Erickson was too intoxicated to book for 11 hours.

Additionally, Kloos was aware of Erickson's incredibly high BAC result, knew that Erickson was an alcoholic, considered him to be at very high risk for alcohol withdrawal, and Erickson informed him that he was shaking and cold. *See Stefan*, 497 Fed. App'x at 574, 578 (denying qualified immunity where official knew that the detainee's BAC was 0.349, knew that he would have no access to alcohol for 10 to 12 hours, knew that he would go through withdrawal, knew that he had a history of seizures, and there was neither medication nor oversight personnel to follow jail's treatment protocol); *see also Lancaster*, 116 F.3d at 1427 (denying qualified immunity to Jailer Jackson, who knew that seizures were life-threatening, actually believed that detainee would have a seizure, and knew that detainee was on top bunk at the time he was expected to have a seizure); *cf. Rusness*, 31

F.4th at 617 (finding defendants entitled to qualified immunity where, among other things, detainee's medical condition was unknown to jail staff).

In addition, there is evidence showing that Kloos did not follow the initial direction of Nurse Sticha to dispense Erickson's readily-available medications on their normal, prescribed schedules, despite Erickson's requests for his medications. *Cf. Rusness*, 31 F.4th at 617 (noting that the detainee repeatedly saw medical professionals, whose instructions the jail officers attempted to follow). As noted, the failure to administer medication as prescribed can constitute deliberate indifference. *Dadd*, 827 F.3d at 755. While Kloos eventually administered Erickson's Lorazepam, "[d]elay in the provision of treatment . . . can violate inmates' rights when the inmates' ailments are medically serious or painful in nature." *Id*. (citing *Johnson–El v. Schoemehl*, 878 F.2d 1043, 1055 (8th Cir. 1989)). There is conflicting expert opinion as to whether administering Lorazepam earlier could have prevented Erickson's death. (*Compare* Keller Report at 25–27, *with* Fowlkes Report at 51.)

While the precedent cited above may involve distinguishing facts that are not present here, the Supreme Court "do[es] not require a case directly on point." *Ashcroft*, 563 U.S. at 741. The Court finds that many of the facts of these cases are sufficiently similar to the conduct here that they gave fair warning of the constitutional violations in question. Accordingly, the Court finds that under these facts, the constitutional rights at issue were clearly established as of May 6 and 7, 2017. *Barton I*, 820 F.3d at 966.

For all of the foregoing reasons, the Court denies summary judgment based on qualified immunity to Kloos and denies Plaintiffs' motion for summary judgment as well.

### c.    Jail Administrator Wright

Jail Administrator Wright also seeks summary judgment based on qualified immunity, while Plaintiffs seek summary judgment on their § 1983 claim against him.  The Court finds that as with Kloos, disputed issues of material fact preclude granting him summary judgment on the basis of qualified immunity and preclude granting Plaintiffs summary judgment.

On the one hand, Wright testified that Erickson did not seem severely intoxicated, although he walked at a slower pace, as if he had back problems.  (Wright Dep. at 90.) Wright recalled that Erickson was coherent and responsive during Kloos' initial intake of Erickson, and nothing about Erickson's condition suggested that he was too intoxicated to admit to the jail.  (*Id*. at 97.)  For instance, he testified that Erickson was not so intoxicated that he was unable to submit to a pat search, make a phone call, photograph, fingerprint, or answer some cursory medical questions.  (*Id*. at 98.)  However, he knew that Erickson had an extremely high BAC (*Id*. at 94–96, 109), and, like Kloos, he found Erickson too impaired to initially book into the jail (Defs.' Answers to First Interrogs. at No. 14), unlike the detainees in *Grayson*, 454 F.3d at 806–07, and *Kelley*, 2020 WL 60644577, at *2–3, who were booked into jail shortly after their arrival.  Wright also knew, as a general matter, that an inmate who cannot be safely booked into jail due to his or her level of intoxication requires medical attention.  (Wright Dep. at 106.)

Wright did not request or provide any medical treatment to Erickson, nor did he direct anyone else to do so.  (*Id*. at 137.)

62

Because of disputed issues of material fact in the record regarding the subjective knowledge of Wright, a jury could find that Wright understood that Erickson had a serious medical need and deliberately disregarded that need.

Finally, the Court turns to whether, under these facts, a reasonable officer in 2017 would have understood that failing to seek medical care for an extremely intoxicated detainee who exhibited Erickson's symptoms would violate the detainee's constitutional rights, such that the right was clearly established. *See Barton I*, 820 F.3d at 967. The Court finds that based on then-existing precedent, noted above, the information that Wright knew at the time, and the situation he encountered, this right was clearly established as of May 2017. There is evidence in the record that Wright was aware of Erickson's extremely high BAC, Kloos testified that he relayed his concerns to Wright about Erickson's very high risk for alcohol withdrawal, and Wright knew that Erickson was too impaired to book into the jail upon arrival and for many hours thereafter. *See Stefan*, 497 Fed. App'x at 574, 578 (discussing official's knowledge of medical condition as a fact relevant to denial of qualified immunity); *cf. Rusness*, 31 F.4th at 617 (discussing official's lack of knowledge among facts relevant to granting qualified immunity). Wright also testified that anyone too intoxicated to book into the jail requires medical attention. (Wright Dep. at 106.)

Regarding whether a reasonable officer in Wright's situation in 2017 would have understood that the delay of Erickson's prescribed medication violated the Constitution, *see Dadd*, 827 F.3d at 757, Wright may have been involved in implementing the jail's policy to delay administering medication to intoxicated detainees until their BAC reaches 0.00. However, there is insufficient evidence showing that he was personally involved in

the decisions concerning Erickson's medications. Accordingly, the Court cannot say that a reasonable officer with Wright's limited involvement would have understood that his conduct violated a clearly established right with respect to the provision of prescribed medications.

Accordingly, for all of the foregoing reasons, as to Count I, brought against Wright in his individual capacity, the Court denies in part summary judgment based on qualified immunity as to the portion of the claim concerning the denial of medical care, but grants his motion in part based on delaying medication as prescribed. The Court likewise denies Plaintiffs summary judgment as to Wright.

### d.    Corrections Officer Spanswick

The County Defendants also seek summary judgment on the basis of qualified immunity as to Corrections Officer Spanswick, while Plaintiffs move for summary judgment on their § 1983 claim against her. The Court finds that disputed issues of material fact preclude a finding of qualified immunity for Spanswick and preclude summary judgment for Plaintiffs.

As to Spanswick's subjective knowledge of Erickson's serious medical need, she contends that while Erickson was intoxicated when she initiated the formal booking process around midnight on May 7, 2017, Erickson was coherent enough to answer questions and advocate for himself by asking about certain medications. (Cnty. Defs.' Mem. at 30.) None of these behaviors, Spanswick argues, demonstrate that she actually knew that Erickson had an objectively serious medical need based on his intoxication, just like the officers in *Grayson* or *Kelley*. (*Id*.)

Moreover, she asserts there is no evidence of any deliberate indifference to Erickson's serious medical need. (*Id*. at 30–31.) Rather, she contends that even if she had knowledge of Erickson's serious medical need, she provided sufficient medical care by calling CentraCare and relying on the advice of Nimmo and Hock. (*Id*.)

As of May 2017, Spanswick had worked at the Todd County Jail for nearly two years. (Spanswick Dep. at 15.) Prior to that, she served as a volunteer first responder, responding to approximately 10 calls per month, in addition to performing other work. (*Id*. at 11–15.) She had received some medical training during her employment at the Todd County Jail, including training on medications. (*Id*. at 15–18.) Although Todd County had not provided any training on alcohol withdrawal as of May 2017, she was familiar with withdrawals from "being in the jail" and "seeing other intoxicated people." (*Id*. at 46–47.) Kloos testified that during the shift change, he had warned Spanswick that Erickson was at "very high risk" of alcohol withdrawal. (Kloos Dep. at 72.) In addition, Spanswick was aware of Erickson's past history of seizures based on the medical questionnaire that she and Mattson completed with Erickson when he was booked into jail. (Spanswick Dep. at 51; *see also* Todd Cnty. Jail Log at P/T 35.)

Spanswick also documented a medical call in Erickson's jail log at 12:44 a.m. regarding "seizure activity." (Todd Cnty. Jail Log at P/T 52.) She testified that she "probably typed it wrong" and meant to type "seizure medications," but could not generally recall why she made the notation. (Spanswick Dep. at 79, 91.) Spanswick testified to her general understanding that inmates should be sent to the hospital if they experience

65

seizures. (*Id*. at 48, 91.)  There is no dispute that Spanswick did not send Erickson to the hospital.

Spanswick could only speculate as to why the log notation stated "seizure activity." Todd County attests that written logs are the best evidence of what occurred.  (Defs.' Interrog. Answers at No. 12) ("Jail logs, reports, and videos are the best evidence of Erickson's interactions with jail personnel.").  Spanswick testified that she was capable of recognizing seizure activity, that her log entries are accurate and reflect her contemporaneous understanding of events, and that if Erickson had merely requested medication, she would not have documented the request in his log, but would have simply called the CentraCare nurse.  (Spanswick Dep. at 44–45, 95–96.)

In addition, Spanswick testified that if she had observed seizure activity, she would have called Wright.  (*Id*. at 44.)  Jail phone records indicate that she in fact phoned Wright at approximately 12:07 a.m., prior to the 12:44 a.m. call to CentraCare.  (Call Records at Row 129 (reflecting call to Wright's cell phone at "5:07" a.m.); Email (explaining that Ex. 201 reflects GMT time, and directing to website instructing to subtract five hours to convert to Central Time); Wright Dep. at 155 (confirming cell phone number).)

On the other hand, CentraCare's Chart Notes, written by Nimmo, do not mention that Erickson experienced a seizure, and instead reflect that Spanswick called because Erickson was requesting his seizure medication.  (Chart Notes at CC-046.)

As to any reliance that Spanswick placed on Nimmo's opinion, officers can only rely on a medical provider's opinion if such reliance is reasonable and they communicate all "facts that should have triggered special concern."  *McRaven v. Sanders*, 577 F.3d 974,

981 (8th Cir. 2009).  Evidence in the record shows that Kloos communicated to Spanswick that Erickson was at very high risk of alcohol withdrawal, Spanswick knew that Erickson had a history of seizures based on the medical intake process, Erickson had identified Lorazepam as his prescribed seizure medication, and Erickson was too intoxicated to book into the jail for 11 hours.  There is no evidence that Spanswick relayed any of this information to Nimmo.

In addition, in *Vaughn v. Gray*, the Eighth Circuit held that based on evidence of a correction officer's knowledge of an inmate's medical symptoms, coupled with the inmate's request for medical assistance (or, in this case, the request for medications), a reasonable jury could find that the official was actually aware that the inmate needed medical attention, "but simply chose to do nothing about it."  557 F.3d at 909.  Several material factual issues are in dispute relevant to Spanswick's knowledge of a serious medical need, including her general observations of Erickson's condition, information that she obtained during the booking and medical screening process regarding his history of seizures and medication for seizures, and whether she observed a seizure.  These issues likewise inform the question of whether she was deliberately indifferent to a serious medical need.

Having found that a jury question remains as to whether Spanswick violated Erickson's constitutional rights, the Court moves to the question of whether the rights at issue here were clearly established.  Given the precedent discussed earlier for the provision of medical care to a severely intoxicated detainee who exhibited the symptoms that Erickson exhibited, *see, e.g., Barton I*, 820 F.3d at 967, and the administration of prescribed

medication, *see, e.g., Dadd*, 827 F.3d at 757, a reasonable officer would have had fair warning in May 2017 that a constitutional violation occurs by failing to provide medical care and prescribed medications to a severely intoxicated detainee exhibiting Erickson's symptoms.   With respect to the information available to Spanswick at the time, she knew that Erickson was unresponsive for several hours into her shift, similar to the extremely intoxicated detainee whom Officer King encountered in *Thompson*, 730 F.3d at 749. Furthermore, there is also evidence that Kloos told Spanswick about Erickson's very high risk for alcohol withdrawal, Spanswick knew that Erickson had a history of seizures based on the medical intake process, Erickson had identified Lorazepam as his prescribed seizure medication, and had either requested his seizure medication or had a seizure.  *See Stefan*, 497 Fed. App'x at 574, 578 (discussing official's knowledge of medical condition as a fact relevant to denial of qualified immunity); *cf. Rusness*, 31 F.4th at 617 (discussing official's lack of knowledge among facts relevant to granting qualified immunity).   Granted, Spanswick contacted the CentraCare nurse about either seizure activity or seizure medication, but it does not appear that she relayed all of the relevant information.  The Court therefore finds that the rights at issue here were clearly established as applied to the situation Spanswick faced.

For all of these reasons, summary judgment based on qualified immunity is denied to Spanswick and summary judgment is likewise denied to Plaintiffs.

e.      **Corrections Officer Mattson**

Corrections Officer Mattson also seeks qualified immunity as to Plaintiffs'
deliberate indifference claim.  The Court finds that Mattson is entitled to qualified
immunity and grants his motion for summary judgment on this basis.

As of May 2017, Mattson was in training as a corrections officer at the Todd County
Jail, where he worked for approximately six months, in between working as a construction
laborer.  (Mattson Dep. at 10–11.)  Mattson had no medical training.  (*Id*. at 11, 49–50.)
On May 6 and 7, 2017, Mattson was in the midst of learning "the whole job," including the
booking process, and Spanswick was his field training officer.  (*Id*. at 13, 16–17.)

Mattson testified that he had received no training regarding when to request medical
attention for an inmate, understanding the symptoms of alcohol withdrawal, or how to
check an inmate's pulse.  (*Id*. at 54–55, 59.)  He did not know whether he had the ability
to send an inmate to a detox center or the hospital.  (*Id*. at 77.)  Moreover, as of May 6,
2017, Mattson testified that he was unfamiliar with alcohol withdrawal in general,
including that it could be a life-threatening condition for chronic alcoholics who are
deprived of alcohol.  (*Id*. at 56, 78.)  He could not recall ever seeing an alcohol withdrawal
assessment protocol.  (*Id*. at 58.)

Although Kloos testified that he alerted Mattson and Spanswick to the "very high
risk" that Erickson would suffer from alcohol withdrawal, Mattson had no memory of
receiving that information.  (*Id*. at 41–42.)  Mattson recalled that Erickson was incoherent,
unresponsive, and intoxicated at the outset of his shift, but did not know any of the
circumstances of Erickson's arrest or the results of his initial BAC test.  (Id. at 51, 87–88,

90.)  He could not recall whether information about offense charges was available to him at the time.  (*Id*. at 51.)

Mattson testified that Spanswick made the decision about booking and screening Erickson, and he could not remember why or how she made that decision.  (*Id*. at 32–33.) Because Mattson was undergoing training, he could not complete medical screenings by himself.  (*Id*. at 62.)   Alongside Spanswick, Mattson filled out Erickson's booking forms, including the medical screening form, (*id*. at 33–40, 100), at which time Erickson coherently answered their screening questions.  (*Id*. at 38.)   Mattson could not recall Erickson experiencing seizures in the jail, saying anything about seizures, or requesting seizure medication.  (*Id*. at 45–46.)  He had no knowledge about Spanswick's phone call to CentraCare, including the reason for her call, and could not recall whether he was aware that Erickson had a number of medications on hand.  (*Id*. at 47–48.)  Mattson stated that he had no knowledge about Erickson's medications or the purposes for which they were prescribed.  (*Id*. at 49–50.) It is undisputed that Mattson provided no medications nor summoned medical treatment for Erickson.  (*Id*. at 95.)

The Court finds that no reasonable jury could find Mattson had subjective knowledge that Erickson had a serious medical need and he deliberately disregarded it. Mattson lacked the training and experience to evaluate inmates, had no understanding of alcohol withdrawal or its symptoms, and had no understanding of the process for seeking medical treatment for detainees, much less that he had the authority to do so.  *See Olson v. Sherburne Cnty.*, No. 070-cv-04757 (JNE/JJG), 2009 WL 1766619, at *5 (D. Minn. June 22, 2009) (finding no deliberate indifference where corrections officer denied an inmate a

nebulizer during an asthma attack because, among other things, "he did not know how to use a nebulizer and was unaware he had the authority to administer such a treatment.") Accordingly, Mattson's motion for summary judgment based on qualified immunity is granted.[11]

### f.   Corrections Officer Sobiech

Corrections Officer Sobiech also seeks qualified immunity as to Plaintiffs' deliberate indifference claim.  (Cnty. Defs.' Mem. at 31–34.)  However, Plaintiffs do not assert any claims against her and she is not named as a defendant.  (*See* Second Am. Compl. at 1, 26, ¶¶ 95–113; *see also* Pls.' Mem. at 62–73 (arguing for summary judgment on deliberate indifference claim against Todd County Defendants Wright, Kloos, and Spanswick).)  Accordingly, Sobiech's motion for summary judgment based on qualified immunity is denied as moot.

### g.   Nurse Sticha

CentraCare Nurse Sticha moves for summary judgment on Plaintiffs' deliberate indifference claim, and Plaintiffs also move for summary judgment against her.  She argues that Plaintiffs confuse an awareness that a person is at risk of alcohol withdrawal with

---

[11] As with McCallum, for purposes of qualified immunity, even if Erickson's constitutional rights were clearly established as of May 2017, i.e., the rights of a detainee to emergency medical care and prescribed medication, and the right of a severely intoxicated detainee to medical care, the facts relevant to Mattson fail to show the violation of these rights, as the Court has discussed above. *Barton I*, 820 F.3d at 966 (noting that the clearly-established-law inquiry regarding the denial of medical care is context-specific).

awareness that a person is actually experiencing alcohol withdrawal. (CentraCare's Mem. at 15.) She also contends that the Todd County Defendants failed to report any concerns about Erickson. (*Id*.) As a result, she argues, she is entitled to summary judgment. (*Id*.) Plaintiffs, however, counter that because Sticha knew of Erickson's medical risks for severe alcohol withdrawal based on her knowledge of his medications, her training and experience, and the knowledge that a corrections officer was "concerned about DTs," she was deliberately indifferent to his serious medical need by failing to direct Kloos to bring Erickson to the hospital and failing to raise any concerns or act at all. (Pls.' Mem. at 73–75.)

As noted, Kloos made two calls to Sticha between May 6 and 7, 2017. Around 4:30 p.m. on May 6, Kloos phoned Sticha regarding Erickson's medications. The following day, at 12:19 p.m., Kloos again phoned Sticha, seeking "advice on DTs." (Todd Cnty. Jail File at P/T 51.) Sticha could not remember the details of either call, and therefore could not testify regarding the decisions she made or why she made them. Nor did she document either call, and could not explain why she failed to do so. (Sticha Dep. at 85.) We are thus left with circumstantial evidence consisting primarily of her general testimony, Kloos' testimony about the phone calls, Todd County's records, and any inferences that may be drawn from this evidence or lack of evidence.

There are no facts in the record showing that Kloos specifically told Sticha about Erickson's BAC level, his history of alcohol-related offenses, or the severity of his intoxication—including the fact that Erickson was too intoxicated to be booked into jail for hours. However, Sticha knew that Erickson was in custody, and from the discussion

concerning medications, she knew, based on her training and experience, that Erickson was taking medications for high blood pressure and alcohol withdrawal. (*Id*. at 95–96.) Also, Sticha testified that as of May 6, she understood, as a general matter, that patients with alcohol dependence who abruptly abstain from alcohol use are at risk of developing alcohol withdrawal syndrome. (*Id*. at 19–20.) She also understood at that time, as a general matter, that medical treatment is required to address the risk of severe alcohol withdrawal, and prompt treatment diminishes the severity of future episodes and the risk of the patient resuming alcohol use. (*Id*. at 25.) Further, Sticha testified to her general knowledge of the timeline for withdrawal symptoms, agreeing that they typically start within four to 12 hours after cessation of alcohol use, and peak within 24 to 48 hours. (*Id*. at 33.)

As to the May 7 call, there is evidence in the record showing that Kloos was concerned about Erickson either experiencing DTs or possibly experiencing DTs, as the jail log expressly states, "Nurse called for advice on DTs." (Todd Cnty. Jail File at P/T 51.) In his deposition, however, Kloos stated that he did not actually report any "concerns" during the May 7 call, describing it as "more of just an informational phone call" to make sure that his actions "were being backed up by Ms. Sticha at that time." (Kloos Dep. at 161.) There is also a factual dispute as to whether Sticha instructed Kloos that Erickson's medication would be sufficient to address DTs, as the jail log indicates, (Todd Cnty. Jail File at P/T 51), or whether his medications would be sufficient to address Erickson's various preexisting conditions, as Kloos testified. (Kloos Dep. at 94–95.) Of course, Sticha knew that one of Erickson's medications was used to treat alcohol withdrawal. (Sticha

Dep. at 95–96.)  In any event, Kloos also testified that Sticha told him to be on the look-out for signs of alcohol withdrawal, such as DTs.  (Kloos Dep. at 94.)

The Court finds that taking the two calls together, the facts set forth above reflect the existence of disputed issues of material fact as to whether Sticha subjectively knew that Erickson was suffering from a serious medical need.  Sticha knew that Erickson was taking medication for alcohol withdrawal, for alcohol abuse, and for high blood pressure, and knew, because he was in custody, that he had not taken his medications for some time.  *See Nur v. Olmstead County*, __ F. Supp. 3d __, No. 19-cv-2384 (WMW/DTS), 2021 WL 4444813, at *13–14, (D. Minn. Sept. 28, 2021) (finding evidence sufficient to support an inference of actual knowledge where providers knew, among other things, that detainee had asked for seizure medication, providers knew the dosage of the medication, and providers knew that the drug was prescribed to treat seizures).  Depending on the information that Kloos relayed regarding "concerns about DTs" during the second call, Sticha may have had additional knowledge of a serious medical need.

As to whether there is evidence from which a jury could find that Sticha deliberately disregarded Erickson's serious medical need, she testified as follows:

> Q:  So, if Todd County personnel calls you and says they're concerned about withdrawals, or they're concerned about DTs, then you're going to be concerned; correct?
>
> A:  Correct.
>
> Q:  And, if you're concerned, then you're going to take these steps, like asking for vitals, symptoms, allergies, and calling the ER provider; right?
>
> A:  Correct.

Q:  So if a nurse didn't do these things—if a nurse took a call from Todd County personnel saying that they're concerned about DTs or withdrawals on an inmate, and if a nurse did not say, get the vitals, get the symptoms, find out the allergies, and let's call the ER, that nurse would be falling well below the standard of care that you're trained on that that you knew at the time; correct?

A:  Yes.

(Sticha Dep. at 92.)  There is no evidence in the record showing that Sticha obtained Erickson's vitals, consulted with the emergency room to develop a plan, inquired about any symptoms of alcohol withdrawal, advised that Erickson be seen in person, or directed Kloos to send Erickson to the hospital.  *See Nur*, 2021 WL 4444813, at *15 (finding fact question as to deliberate indifference and noting no evidence in the record showing that nurses consulted with the physician overseeing detainees' care when deciding to withhold seizure medication).

Again, the Court finds that disputed issues of material fact preclude granting summary judgment to Sticha or to Plaintiffs.  Accordingly, their respective motions are denied.

### h.    Nurse Nimmo

Nurse Nimmo argues that she is entitled to summary judgment on Plaintiff's deliberate indifference claim against her, while Plaintiffs argue that they are entitled to summary judgment.  As noted earlier, Spanswick phoned Nimmo on May 7 regarding either "seizure activity" or "seizure medication."  (CentraCare's Mem. at 13.)  Nimmo contends that the CentraCare medical records of the call do not describe any obvious medical need, but simply an inmate's request to take medication.  (Chart Notes at CC-046.)

75

Plaintiffs, however, assert that Nimmo knew that Erickson needed individualized treatment for severe alcohol withdrawal, but deliberately disregarded the risk and limited her advice to seizure medication. (Pls.' Mem. at 76.)

Like Sticha, Nimmo could not independently remember her conversations with Spanswick, and her testimony relied on the notes that she had entered into Erickson's chart. (Nimmo Dep. at 58, 80–81.) Her notes reflect Nimmo's knowledge that Erickson was requesting seizure medication. Specifically, Nimmo's notes state that Erickson requested Vicodin and Lorazepam, and Nimmo also listed certain of his other medications, including Antabuse and Amlodipine. (Chart Notes at CC-046.) Her medical notes also state, apparently incorrectly, that none of Erickson's medications were prescribed for alcohol withdrawal, and that Lorazepam was used to treat anxiety. (*Id.*)

The Court finds that there is insufficient evidence in the record upon which a reasonable jury could find evidence of Nimmo's subjective knowledge of Erickson's serious medical need. Granted, Nimmo testified that she knew Erickson was an alcoholic because he was prescribed Antabuse, and she knew that alcoholics who abruptly cease alcohol consumption are at risk of alcohol withdrawal. (Nimmo Dep. at 61–62.) She also knew that Amlodipine was prescribed for high blood pressure. (*Id*. at 61.) But her notes reflect that she did not know Lorazepam was used to treat symptoms of alcohol withdrawal, such as seizures. *Cf. Nur*, 2021 WL 4444813, at *13 (stating, "[T]here is no question Defendants know that [detainee's medications] are prescribed to treat seizures/epilepsy."). While her mistaken belief might be relevant to a negligence claim, it precludes an inference of Nimmo's subjective knowledge of Erickson's serious medical need. "[A] claim of

negligence . . . is insufficient to maintain a section 1983 claim." *Corwin v. City of Independence*, 829 F.3d 695, 698 (8th Cir. 2016)

 In addition, the medical records contain no reference to Erickson experiencing a seizure in jail, but instead reflect that Erickson "was up to the bathroom and did take some food without concerns." (Chart Notes at CC-046; *see also* Nimmo Dep. at 72.) And, as noted earlier, nothing in the record shows that Spanswick communicated to Nimmo the concerns of Kloos that Erickson was at very high risk of alcohol withdrawal, that Erickson had a history of seizures, that Erickson had identified Lorazepam as his prescribed seizure medication, and that he was too intoxicated to book into the jail for 11 hours.

But even if evidence in the record conclusively demonstrated Nimmo's subjective knowledge of Erickson's serious medical need, or created a fact question, no reasonable juror could find that the evidence gives rise to a finding of deliberate indifference. As noted, deliberate indifference is a high standard, requiring a mental state akin to criminal recklessness, and "more than negligence, more even than gross negligence." *Jackson v. Buckman*, 756 F.3d 1060, 1065–66 (8th Cir. 2014) (citations omitted). Rather than disregard questions about Erickson's medications, Nimmo was diligent in seeking the opinion of PA Hock, and affirmatively relaying his opinion back to Spanswick. (Nimmo Dep. at 75–76.)

For all of the foregoing reasons, the Court finds that Plaintiffs' deliberate indifference claim against Nimmo fails as a matter of law. Accordingly, the Court grants Nimmo's motion and denies Plaintiffs' motion in this regard.

i.      **PA Hock**

PA Hock also argues that he is entitled to summary judgment on Plaintiffs' deliberate indifference claim, and Plaintiffs seek summary judgment against him, arguing that Hock knew Erickson required individualized treatment for alcohol withdrawal and provided care that fell below the appropriate standard of care by denying Erickson his medications until his BAC reached 0.00.  (Pls.' Mem. at 77–78.)

The Court finds that disputed issues of material fact preclude summary judgment in favor of either party.  Whether Hock subjectively knew of Erickson's serious medical need remains in dispute.  CentraCare's medical records reflect that after Nimmo spoke with Spanswick, she talked to Hock.  (Chart Notes at CC-046.)  Nimmo relayed Erickson's relevant information to Hock, including information about his medications, BAC levels, alcoholism and hypertension, cessation of alcohol, and his request for "seizure medication."   (Chart Notes at CC-46; CentraCare's Answers to Second Req. for Admissions at Nos. 37–44.)  Like his medical colleagues Sticha and Nimmo, Hock has no recollection of those conversations, nor of any actions that he took with respect to Erickson. (Hock Dep. at 115.)

However, Hock knew as of May 2017 that Antabuse is a medication used to treat alcoholism, Amlodipine is used to treat high blood pressure, and Lorazepam is used to treat alcohol withdrawal.  *See Nur*, 2021 WL 4444813, at *13 (stating that medical providers' knowledge that certain medications were used to treat seizures, coupled with knowledge of detainee's request for the medications, were factors supporting an inference of subjective knowledge of the detainee's serious medical need).  As a general matter, Hock

agreed that he knew as of May 6, 2017, that proper management of alcohol withdrawal syndrome requires identifying the condition, and assessing the patient's risk of complications. (Hock Dep. at 20–21.) He was aware that when alcohol is consumed in large quantities for more than two weeks and then abruptly discontinued, withdrawal symptoms are likely to occur and can be fatal. (*Id.* at 22, 166–67.)

The Court finds that the question of whether Hock was deliberately indifferent to Erickson's serious medical need is a disputed issue of material fact. In particular, the scope of Hock's order regarding when Erickson's medications could be administered is very much in dispute. Hock argues that he "never ordered the complete deprivation of medication and instead simply recommended a delay in administration." (CentraCare's Opp'n [Doc. No. 99] at 5.) Hock testified that he directed that Vicodin and Ativan (generically known as Lorazepam) not be given to Erickson, explaining, "Vicodin, which is an opiate, and a benzodiazepine have high risk for respiratory depression, and especially in the presence of a blood alcohol of .123, and that's why I made my decision to hold the medicines until his blood alcohol was lower." (Hock Dep. at 154–55.) As noted earlier, Nurse Nimmo's note in Erickson's chart makes no such distinction as to medications, and states, "I talked to Tom Hock PA and he reviewed [Erickson's] blood alcohol and medication review [sic] he stated would not give medications until his blood alcohol was 0 [sic] Connie at the jail was called and informed[.]" (Chart Notes at CC-046.)

Hock testified that in making his decision, he did not review Erickson's chart, review the prescription dosages, examine or talk to him, take his vitals, or make any inquiry into whether Erickson had prior withdrawal episodes, DTs, or seizures. *See Dadd*, 827

F.3d at 756 ("When an official denies a person treatment that has been ordered or medication that has been prescribed, constitutional liability may follow."); *Nur*, 2021 WL 4444813, at *14 ("Because it is undisputed that Defendants refused Nur his seizure medication, the question necessarily becomes whether that refusal was based on an adequate inquiry or reflected a reckless disregard of Nur's serious medical need."); *Mace v. Johnson*, No. 11-cv-477 (MJD/LIB), 2014 WL 538580, at *11 (D. Minn. Feb. 11, 2014) (finding fact issue as to deliberate indifference where medical provider withheld medication without reviewing medical records or examining the inmate).   Hock could not recall why he did not ask Nimmo or Spanswick to obtain Erickson's vital signs and relay the information to him.  (Hock Dep. at 157–60.)  He testified that if Erickson had presented in person at CentraCare, he would have "certainly done a risk assessment," which he agreed is the standard of care.  (*Id*. at 161–63.)

In light of disputed issues of material fact, the Court denies summary judgment to Plaintiffs and to Hock.

### C.     *Monell* & *City of Canton* Claim (Count 2)

As noted, Plaintiffs assert a § 1983 claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), against Pope County, Sheriff Riley, Todd County, Jail Administrator Wright, Sheriff Och, and CentraCare.  (Second Am. Compl., Count 2.)  Pursuant to *Monell*, 436 U.S. at 690–95, a municipality is a "person" that can be held liable under § 1983 to the extent a formal local government policy or an informal custom promulgated by the local government's officials precipitated the alleged constitutional violation by its individual

80

employees.  Under *City of Canton*, 489 U.S. at 378, *Monell* liability may attach where a local government fails to train its employees.

### 1.    Medication/BAC Policy (*Monell* Claim, Count 2)

As a general matter, Plaintiffs contend that under *Monell*, Todd County's medical care policies for detainees fail to provide adequate safeguards, reflecting a deliberate indifference to the detainees' constitutional rights.  (Second Am. Compl. at ¶¶ 126–27.) Pursuant to that claim, Plaintiffs move for summary judgment against Todd County and CentraCare based on their policy[12] of "categorically denying all medications to all inmates until they hit .00 BAC" (hereinafter, the "medication/BAC policy").  (Pls.' Mem. at 56, 82–84; *see also* Pls.' Opp'n at 48.)

The County Defendants and CentraCare also move for summary judgment, arguing that because Plaintiffs fail to establish an underlying constitutional violation, they cannot maintain a claim based on an unconstitutional policy.[13]   (Cnty. Defs.' Mem. at 37;

---

[12] Corrections Officer Sobiech and Jail Administrator Wright attributed the medication/BAC policy to CentraCare, (Sobiech Dep. at 127–28; Wright Dep. at 82), although Wright could not identify the particular person at CentraCare who issued it. (Wright Dep. at 82.)

[13] The County Defendants also briefly argue in their Reply Memorandum that the medication/BAC policy cannot serve as the basis for Plaintiffs' *Monell* claim because Plaintiffs did not specifically refer to it in their pleadings.  (Cnty. Defs.' Reply [Doc. No. 110] at 9.)  The Court disagrees and finds that the medication/BAC policy is encompassed by Plaintiffs' general allegations in Count 2 regarding Todd County's "policies [for] the provision of medical treatment for detainees with objectively serious medical needs" that provide "inadequate safeguards for protecting detainees' constitutional rights."  (Second Am. Compl. ¶ 126.)  Defendants essentially interpret the claim as such, having responded to Plaintiffs' medication/BAC-policy arguments on the merits, in detail, throughout their briefing.  (Cnty. Defs.' Opp'n at 33–37; Cnty. Defs.' Reply at 9–10; CentraCare's Reply [Doc. No. 122] at 8; CentraCare's Opp'n at 8–9.)  Defendants' memoranda make clear that

CentraCare's Mem. at 16.)  Moreover, they argue that the policy is not unconstitutional, but even if it were, Plaintiffs cannot establish causation.  (Cnty. Defs.' Mem. at 37; CentraCare's Mem. at 16.)  Finally, the County Defendants assert that Plaintiffs' *Monell* claim fails because there is no evidence that they or CentraCare received notice that their policies or procedures were inadequate and likely to result in a constitutional violation. (Cnty. Defs.' Mem. at 37–38.)

As noted, Defendants contend they are entitled to summary judgment on Count 2 because Plaintiffs' underlying deliberate indifference claims against the Individual Defendants fail as a matter of law.  (Cnty. Defs.' Mem. at 37; CentraCare's Mem. at 15– 16.)  In general, plaintiffs seeking to impose liability on a local government under § 1983 must first establish individual liability on an underlying substantive claim.  *Stockley v. Joyce*, 963 F.3d 809, 823 (8th Cir. 2020) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* liability.") (citing *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007)) (internal citations omitted).   The Court has found that disputed issues of material fact preclude summary judgment on Count 1 as to all of the Individual Defendants except McCallum, Mattson, and Nimmo.  *See supra* at

---

they are familiar with the evidence related to the medication/BAC policy, and have had the opportunity to take and respond to discovery on this issue. Accordingly, the Court considers all of the parties' summary judgment motions concerning an unconstitutional policy under *Monell* as relating to the medication/BAC policy.

II.B.  Because liability on Count 1 remains an open question as to certain Individual Defendants who work for Todd County and CentraCare, it cannot form the basis for granting summary judgment to Todd County, Sheriff Och, Jail Administrator Wright, or CentraCare on Count 2.  However, because Count 1 against McCallum fails as a matter of law, Count 2 fails against her employer, Pope County, and Sheriff Riley, for whom summary judgment is granted.  *Sanders*, 474 F.3d at 527 (finding no municipal liability, absent a constitutional violation by an individual officer).

Under *Monell*, a plaintiff must prove that "action pursuant to official municipal policy" caused the alleged injury.  436 U.S. at 691.  A county is liable under § 1983 if the policy itself violated federal law, or "if the action or policy was lawful on its face but led an employee to violate a plaintiff's rights [and the county's action] was taken with 'deliberate indifference' as to its known or obvious consequences."  *Pietrafeso v. Lawrence Cnty.*, 452 F.3d 978, 982 (8th Cir. 2006); *see also Szabla  v. City of Brooklyn Park*, 486 F.3d at 390 (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Oka. v. Brown*, 520 U.S. 397, 405 (1997)).  Where a plaintiff alleges that a particular policy itself caused the constitutional violation, or directs an employee to do so, "resolving the issues of fault and causation is straightforward."  *Brown*, 520 U.S. at 404.  In order to establish such a violation, "no evidence is needed other than a statement of the municipal policy and its exercise."  *Szabla*, 48 F.3d at 390 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion)).

a.       **The Policy**

Plaintiffs contend that by maintaining a policy of denying all inmates their prescribed medications until they reach 0.00 BAC, Todd County and CentraCare compel their employees to violate the Constitution.  (Pls.' Mem. at 82–83.)    In other words, Plaintiffs contend that the medication/BAC policy is unconstitutional on its face, asserting that the policy itself directs employees to cause the constitutional violation.  Indeed, the due process obligation to provide medical care to detainees may be violated when officials intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment.  *Dadd*, 827 F.3d at 757; *see also Foulks v. Cole Cnty.*, 991 F.2d 454, 455–57 (8th Cir. 1993) (finding liability where jail officials disregarded instruction sheet from plaintiff's doctor, ignored complaints of sickness and pain, and refused to provide medication they were aware was prescribed); *Majors v. Baldwin*, 456 Fed. App'x. 616, 617 (8th Cir. 2012) (unpublished per curiam) (holding that plaintiff established deliberate indifference claim where defendants withheld prescribed pain medication and failed to provide adequate post-operative treatment); *Phillips*, 437 F.3d at 795–96 ("[T]he knowing failure to administer prescribed medicine can itself constitute deliberate indifference."); *Strahan v. Rottnek*, No. 4:13CV448 SNLJ, 2015 WL 249448, at *4–5 (E.D. Mo. Jan. 20, 2015) (finding that inmate raised a triable issue as to an Eighth Amendment violation where jail doctor's policy of substituting over-the-counter medication for prescribed medication was applied to plaintiff without any medical determination regarding plaintiff's medical need for narcotic prescription medication for his chronic pain).

84

As an initial matter, Todd County and CentraCare do not appear to seriously dispute whether the medication/BAC policy was, in fact, a "policy."  Several Todd County officers and Jail Administrator Wright testified to their awareness of the policy and their belief that it originated from CentraCare. (Kloos Dep. at 159–60; Sobiech Dep. at 127–28; Wright Dep. at 82.)  In addition, in response to Plaintiffs' interrogatories, Todd County referred to it as "jail policy."  (Defs.' Answers to Second Interrogs. at No. 17) ("Based on jail policy, Kloos did not administer medications until the PBT was .00[.]").

### b.   Application of the Policy

However, the parties strongly dispute whether the "statement of the [] policy and its exercise" was unconstitutional, *Szabla*, 48 F.3d at 390,  and whether it directed employees to categorically apply it to all inmates.  As a general matter, Todd County and CentraCare point to evidence showing that they did not necessarily apply the policy categorically. (CentraCare's Opp'n at 8) (citing Wright Dep. at 194–95) (discussing situations in which the jail gave insulin to diabetic inmates with BAC results above 0.00).  But as Plaintiffs note, there is evidence that Todd County corrections officers understood the policy applied categorically, and Plaintiffs argue that evidence of occasional "exceptions" suggests that absent such exceptions, the policy applied to all inmates by default.  (Pls.' Reply [Doc. No. 111] at 14.)  Thus, evidence in the record supports the remaining parties' differing positions and precludes summary judgment.

As to the application of the policy to Erickson, Todd County and CentraCare assert that PA Hock's advice about the medication was based on specific information regarding Erickson and his needs, and did not reflect the blind application of a categorical policy.

(Cnty. Defs.' Mem. at 35) (citing Hock Dep. at 154–55).   There is also evidence in the record that Hock only directed that some of Erickson's medications be delayed, not all of them, although CentraCare's records suggest that Hock's direction applied to all of Erickson's medications, and Todd County staff interpreted it as such.   Moreover, Plaintiffs contend that even before Hock's direction, and regardless of whether he was following the policy, the Todd County Defendants adhered to the policy, as they knew when Erickson arrived at the jail, he had been prescribed Lorazepam twice daily, (Todd Cnty. Jail File at P/T-54), but withheld Erickson's medications during all of May 6 due to the policy.   (Kloos Dep. at 69–70.)   These disputed issues of material fact preclude summary judgment.

### c.   Causation

The parties also dispute the element of causation.   Plaintiffs contend that pursuant to the policy, Todd County and CentraCare denied Erickson's medications for roughly 24 hours after he was booked into jail, during which time his withdrawal symptoms progressively worsened.   (Pls.' Mem. at 84.)   Application of the policy led to the denial of Lorazepam, the "drug of choice" for treating alcohol withdrawal, during this time period, Plaintiffs contend.   (Umsted Decl., Ex. S (Kingston Report) at 7.)   However, CentraCare maintains that "Erickson had a less than 12-hour delay in the administration of his medication from the time he requested 'seizure medication,'" which it characterizes as a "short delay," and Erickson ultimately received the medication. (CentraCare's Opp'n at 5.) But Plaintiffs' expert, Dr. Keller, opines that there "is no medical justification to wait until the BAC is 0" prior to administering Lorazepam, and doing so would only allow withdrawal to progress and symptoms to worsen.   (Keller Report at 10.)   These material

issues of fact concerning causation remain very much in dispute, further precluding summary judgment for any of the remaining parties on Plaintiffs' *Monell* claim.

### d.   Notice

The Todd County Defendants also argue that Plaintiffs have failed to demonstrate that either Todd County or CentraCare received notice that the policy was inadequate. (Cnty. Defs.' Opp'n [Doc. No. 94] at 35–36) (citing *Parrish v. Ball*, 594 F.3d 993, 997–98 (8th Cir. 2010)). When a policy is lawful on its face and does not compel unconstitutional action by an employee, courts apply a deliberate-indifference analysis, as in failure-to-train cases under *City of Canton*. *Szabla*, 486 F.3d at 390. *Parrish*, the case on which the Todd County Defendants rely, is a failure-to-train case, in which the Eighth Circuit noted that to succeed on a failure-to-train case, the plaintiff must demonstrate that "the county had notice that its procedures were inadequate and likely to result in the violation of constitutional rights." 594 F.3d at 998 (cleaned up).

Plaintiffs' claim appears to assert that the policy itself was facially unlawful, but even if notice is required, the Court finds that notice is satisfied because as of May 2017, under *Dadd*, 827 F.3d at 757; *Phillips*, 437 F.3d at 796; and *Estelle*, 429 U.S. at 104–05, it was clearly established that jail officials cannot intentionally deny or delay access to prescribed medication or intentionally interfere with prescribed treatment. *See Dadd*, 827 F.3d at 757 (finding that defendants had "fair warning about the unconstitutionality of a failure to provide pain medication" based on Eighth Circuit legal authority to that effect); *Szabla*, 486 F.3d at 394 (examining whether clearly established law gave notice of unconstitutional action). The Todd County Defendants argue that Plaintiffs' authority is

distinguishable because Plaintiffs rely on cases "regarding policies not permitting pain medication to be provided to inmates without a medical determination regarding the inmate's medical need."  (Defs.' Reply at 9–10) (citing only *Dadd*, 827 F.3d at 757).  However, *Dadd* does not appear to involve a policy or practice.  Moreover, it involved officials who, among other things, ignored a jail physician's prescription for the inmate.  *See Dadd*, 827 F.3d at 752–54.  Further, as Plaintiffs note, regardless of Hock's conduct, there is evidence in the record showing that the Todd County Defendants followed the policy for hours before Hock became involved.  (Pls.' Reply at 12.)  Accordingly, for all of the foregoing reasons, the remaining Defendants are not entitled to summary judgment.

Because disputed issues of material fact exist as to Plaintiffs' *Monell* claim regarding the medication/BAC policy, the parties' cross motions for summary judgment are denied as to Todd County, CentraCare, Sheriff Och, and Jail Administrator Wright.  As previously noted, the County Defendants' summary judgment motion is granted as to Pope County and Sheriff Riley.

### 2.      Failure to Train (*City of Canton* Claim, Count 2)

Plaintiffs' failure-to-train claim in Count 2 alleges that CentraCare, Todd County, and Todd County's named officials in their official capacities, Sheriff Och and Jail Administrator Wright, are liable under § 1983 for inadequate training on the provision of medical treatment for detainees experiencing severe alcohol intoxication and/or withdrawal.[14]  (Second Am. Compl. ¶¶ 116–23.)  Plaintiffs contend that pursuant to *City*

---

[14] Although Plaintiffs also assert this claim against Pope County and Sheriff Riley, because the Court has found no underlying liability for McCallum, it finds no liability on

*of Canton*, 489 U.S. at 378, Todd County and CentraCare provide constitutionally inadequate training to Todd County employees regarding the provision of medical treatment for detainees experiencing severe alcohol intoxication and/or withdrawal. (Second Am. Compl. ¶¶ 116–123.)   In particular, Plaintiffs move for summary judgment against Todd County and CentraCare for their alleged failure to train their employees to: (a) recognize signs and symptoms of illness; (b) recognize signs and symptoms of chemical dependency; and (c) screen for withdrawal risks.  (Pls.' Mem. at 84.)

Todd County, Och, and Wright also seek summary judgment, arguing that they adequately train officers on recognizing detainees' needs for medical attention, signs of alcohol withdrawal, and risks of alcohol withdrawal.  (Cnty. Defs.' Mem. at 35; Cnty. Defs.' Reply [Doc. No. 110] at 8–9.)  Moreover, they argue that in order to maintain this claim against Och and Wright in their official capacities, Plaintiffs must prove that Todd County itself caused the constitutional violation at issue, which Plaintiffs have failed to do. (Cnty. Defs.' Mem. at 35–36.)  Finally, they contend that there is no evidence showing that they received notice of inadequate training practices.  (*Id*. at 36.)

CentraCare also moves for summary judgment.   While Plaintiffs allege that CentraCare's contract with Todd County placed it on notice of its obligation to provide training to ensure adequate medical treatment for detainees, (Second Am. Compl. ¶ 122), CentraCare argues that any alleged failure on its part to meet its contractual training

---

the failure-to-train portion of Count 2 against Pope County and Sheriff Riley.  *Sanders*, 474 F.3d at 527.   Accordingly, the Court confines its discussion to the remaining Defendants.

obligations with the Todd County Jail does not establish insufficient training or notice of insufficiencies. (CentraCare's Reply [Doc. No. 112] at 9.)

Failure-to-train liability is an offshoot of liability under *Monell* in which "the failure to provide proper training may be fairly said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton*, 489 U.S. at 390. To establish a failure-to-train claim, a plaintiff must demonstrate that: (1) the county's training practices were inadequate; (2) the county was deliberately indifferent to the rights of others in adopting them, such that the "failure to train" reflects the county's deliberate or conscious choice; and (3) an alleged deficiency in the training procedures actually caused the plaintiff's injury. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (citing *City of Canton*, 489 U.S. at 389)). The Eighth Circuit has also stated that a failure-to-train claim cannot succeed without evidence that the government entity "[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]." *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1216–17 (8th Cir. 2013) (discussing requirement of notice in cases against supervisor for failure to supervise and failure to train) (citing *Parrish*, 594 F.3d at 1002) (internal quotations omitted).

### a.    Adequacy of Training Practices

As to the adequacy of Todd County's training practices concerning the medical care of intoxicated detainees, there is evidence in the record to support a finding that they were inadequate. Several officers testified that prior to May 6 and 7, 2017, Todd County provided no such training. (Spanswick Dep. at 46, 48; Wright Dep. at 45–46.) However, other testimony lends support to a finding that officers were trained on recognizing the

need for medical attention, signs of alcohol withdrawal, and the risks of alcohol withdrawal, although the training was not necessarily provided by Todd County or CentraCare. (Kloos Dep. at 15–17, 71, 118–18; Spanswick Dep. at 11–17, 19–25; Sobiech Dep. at 39–41, 48, 75–76.) This evidence will also be relevant to causation.

With respect to CentraCare, its contract with Todd County required it to "[p]articipate in and or approve the training program of Jail Staff" in several procedures, including basic first aid, CPR, "[r]eceiving screening," recognition of symptoms of common illnesses; and medication delivery."[15] (2015 Todd Cnty./CentraCare Agmt. at P/T 2542; CentraCare Dep. at 35–36.) CentraCare acknowledges that training in such areas is vitally important to detainees' safety and health. (CentraCare Dep. at 39.) Evidence in the record demonstrates that disputed issues of material fact exist as to whether CentraCare provided training relevant to medical care for intoxicated detainees, including training on alcohol withdrawal, to Todd County jail employees. (*Compare id*. at 35–36, 56 (discussing lack of training), *with* Kloos Dep. at 107–08 (stating that he received training from a CentraCare nurse on protocols regarding "Withdrawal Orders/Alcohol and Combination of Other Drugs in [the] System" prior to May 6, 2017.)

---

[15] CentraCare argues that any contractual breaches fail to establish constitutional violations, and note that Plaintiffs could not assert breach of contract claims. (CentraCare Opp'n at 10 & n.2.) But Plaintiffs properly note that by agreeing to train Todd County correctional officers, CentraCare exposed itself to constitutional liability for failing to train them. *See West v. Atkins*, 487 U.S. 42, 51 (1988) (finding that doctor who was contractually obligated to provided medical services to inmates at a state prison was liable under § 1983 when he treated the inmate, as the conduct was fairly attributable to the state).

Accordingly, in light of disputed issues of material fact in the record, the Court is unable to determine, as a matter of law, the adequacy of the training procedures of Todd County and CentraCare with respect to the medical care of intoxicated detainees.

### b.      Deliberate Indifference and Notice

Without a pattern of constitutional violations, an isolated, one-time incident does not make the need for additional training obvious, such that the county's actions could be considered deliberately indifferent. *Szabla*, 486 F.3d at 390. However, a single violation of constitutional rights can lead to municipal liability "where the violation is accompanied by a showing that the municipality had 'failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Id.* at 393 (quoting *Brown*, 520 U.S. at 409).

First, as to whether Todd County's employees encounter a recurring situation regarding the medical care of intoxicated detainees, evidence in the record demonstrates that Todd County corrections officers have encountered intoxicated detainees in the past, including severely intoxicated detainees. (*See, e.*g., Spanswick Dep. at 91–92; Sobiech Dep. at 43, 47–48, 51.) Todd County corrections officers must make determinations about whether an intoxicated inmate can be safely admitted and housed in the jail, or whether the inmate must be sent to a detox facility or the hospital. (Wright. Dep. at 34–35.) This evidence supports a finding of a recurring situation, i.e., the situation of jail staff encountering severely intoxicated detainees who may require medical care and for whom jail staff must decide whether to admit them to the jail, send them to a detox facility, or send them to the hospital. *Szabla*, 486 F.3d at 393.

Second, as to whether this recurring situation presented an obvious potential for a constitutional violation, *Brown*, 520 U.S. at 409, courts consider whether the employee violated a "clear constitutional duty" and whether there were "clear constitutional guideposts." *Szabla*, 486 F.3d at 393 (citation omitted). The Eighth Circuit has emphasized that "[c]larity of the municipal obligation is important in this context, because '[w]ithout some form of notice to the [county], and the opportunity to conform to constitutional dictates [as to] both what it does and what it chooses not to do, the failure to train theory could completely engulf *Monell*, imposing liability without regard to fault.'" *Id.* (quoting *City of Canton*, 498 U.S. at 395) (J. O'Connor, concurring in part).

An officer who "fail[s] to seek medical care for an intoxicated arrestee who exhibits symptoms substantially more severe than ordinary intoxication violates [an] arrestee's constitutional rights, all the more so when the surrounding circumstances indicate that a medical emergency exists." *Barton I*, 820 F.3d at 967. Accordingly, the clarity of the constitutional duty demonstrates notice, as the Court found with respect to Plaintiffs' claim based on the medication/BAC policy. *Dadd*, 827 F.3d at 757 (finding that defendants had "fair warning about the unconstitutionality of a failure to provide pain medication" based on Eighth Circuit legal authority to that effect); *Szabla*, 486 F.3d at 394 (examining whether clearly established law gave notice of unconstitutional action).

The Court therefore finds that because the Todd County employees encounter this clear constitutional duty on a recurring basis, the "need for training or other safeguards" relating to the medical care for severely intoxicated arrestees or detainees was obvious as of May 2017, such that the failure to train or provide safeguards to avoid constitutional

violations could be characterized as deliberate indifference. *Cf. Szabla*, 486 F.3d at 393 (finding that because the right to an advance warning prior to commanding police canine to bite was not clearly established at the relevant time, the need for training or other safeguards related to warnings was not so obvious that the city's actions can be characterized as deliberately indifferent to plaintiff's constitutional rights). Again, the adequacy of the training itself remains a disputed issue of material fact.

**c.   Causation**

Finally, disputed issues of material fact preclude summary judgment on the element of causation. Based on the testimony of numerous witnesses, set forth earlier, as well as other evidence in the record, there is evidence from which a jury could find that Todd County and CentraCare caused a constitutional violation.

In sum, as to the portion of Plaintiffs' failure-to-train claim applicable to Pope County, because the underlying claim against McCallum in Count 1 fails as a matter of law, Count 2 fails against her employer, Pope County, and Sheriff Riley, for whom summary judgment is granted. *Sanders*, 474 F.3d at 527 (finding no municipal liability, absent a constitutional violation by an individual officer). However, for all the foregoing reasons, due to disputed issues of material fact, the Court denies summary judgment to Todd County, CentraCare, Sheriff Och, and Jail Administrator Wright on Plaintiffs' failure-to-train claim in Count 2. The Court likewise denies summary judgment to Plaintiffs against Todd County and CentraCare.

### D.    Wrongful Death Claim Based on Negligence Asserted Against All Defendants (Count 3)

Plaintiffs seek summary judgment on their claim for wrongful death, premised on negligence, arguing that Defendants breached their duty to Erickson by denying him medical care and causing his death.  (Pls.' Mem. at 89–91.)  Further, they contend that the County Defendants are not entitled to official immunity.  (*Id.* at 91.)

The Individual County Defendants argue that they are entitled to summary judgment based on official immunity, and that Todd County, Pope County, Sheriff Riley, and Sheriff Och are likewise entitled to vicarious official immunity.  (Cnty. Defs.' Mem. at 39–43.)  Even on the merits, they assert that summary judgment should be granted because they were under no duty of care to protect Erickson from an unforeseeable harm.  (*Id.* at 39–40.)

The CentraCare Defendants argue that because of Plaintiffs' status as representatives of the decedent, they cannot maintain a stand-alone, direct cause of action for medical malpractice (as Plaintiffs assert in Count 4). (CentraCare's Mem. at 16–18.)  They contend that Plaintiffs' claims in Counts 3 and 4 should be treated simply as a single wrongful death claim premised on medical malpractice, which is the applicable form of "negligence" here.  (*Id.* at 18.)  The Court agrees and addresses this claim *infra* at II.E.

### 1.    Official Immunity

As noted, the County Defendants move for summary judgment based on official immunity.  Official immunity "protects public officials from the fear of personal liability that might deter independent action and impair effective performance of their duties."

*Elwood v. Rice Cnty.*, 423 N.W.2d 671, 678 (Minn. 1988). It provides that a public official "charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 655 (Minn. 2004) (internal quotation marks and citation omitted). Official immunity may apply to any state law claim based on an official's discretion or professional judgment, depending on the question of malice. *Dokman v. Cnty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001). However, in contrast to discretionary acts, public officials are not entitled to official immunity in connection with ministerial acts, i.e., acts "involving merely the execution of a specific duty arising from fixed and designated facts." *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014) (citation omitted).

Courts "'must determine whether a genuine issue of material fact exists as to whether [the official's] actions could constitute a willful or malicious wrong.'" *Fisher v. State, Dept. of Corr.*, No. A06-76, 2007 WL 1673642, at *6 (Minn. Ct. App. June 12, 2007) (citing *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991)). For purposes of official immunity, malice "means intentionally committing an act that the official has reason to believe is legally prohibited." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999). In order to defeat a showing of malice, public officials must demonstrate that their conduct meets one of three tests: "(1) that the conduct was 'objectively' legally reasonable, that is, legally justified under the circumstances; (2) that the conduct was 'subjectively' reasonable, that is, taken with subjective good faith; or (3) that the right allegedly violated was not clearly established, that is, that there was no basis for knowing the conduct would

violate the plaintiff's rights." *Fisher*, 2007 WL 1673642, at *6 (citing *Gleason v. Metro. Council Transit Ops.*, 563 N.W.2d 309, 317, 318 n.3 (Minn. 1997)). Minnesota courts have found that conduct that rises to the level of deliberate indifference, in violation of the Constitution, cannot be either objectively reasonable or subjectively reasonable. *Id*. (finding disputed issues of material fact precluded official immunity).

The Court first turns to the two Individual County Defendants whose conduct this Court has found was not deliberately indifferent to Erickson's serious medical need— Defendants McCallum and Mattson. In light of that finding, McCallum and Mattson may also be entitled to official immunity on Plaintiffs' negligence claim, unless their conduct was ministerial in nature. *Vassallo*, 842 N.W.2d at 462. Referring to all of the Individual Defendants, Plaintiffs contend that their conduct "includes" the "failure to perform ministerial duties." (Pls.' Mem. at 91; Pls.' Reply at 18.) Specifically, Plaintiffs identify testimony from Wright and Spanswick regarding the Todd County Jail's policy requiring officers to send detainees to the hospital if they suspect a seizure or DTs, and Minnesota's regulatory requirement, Minn. R. 2911.5000, subp. 5, that officers perform well-being checks every 30 minutes for healthy inmates, and every 15 minutes for those experiencing withdrawal from drugs or alcohol. (Pls.' Mem. at 91; Pls.' Reply at 18.)

While a policy that "narrows the standard of an officer's conduct to simple and definite tasks" may reflect a ministerial duty, *see Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998), the evidence here fails to create a fact question as to whether either McCallum or Mattson, specifically, had reason to believe Erickson was experiencing a seizure or DTs, or that they were negligent in performing well-being checks.

To the extent Plaintiffs premise negligence liability on the involvement of McCallum and Mattson in booking Erickson into their respective facilities and failing to seek medical care at booking, in general, courts have found similar conduct to be discretionary. *See Wendy v. Cnty. of Mille Lacs*, No. A13-0114, 2013 WL 4711210, at *5 (Minn. Ct. App. Sept. 3, 2013) (finding that decision to return detainee to a cell in the general prison population was not an act in which nothing was left to discretion, and thus, the decision was protected by official immunity absent deliberate indifference); *see also Rusness*, 31 F.4th at 618 (noting that an inmate's request for pain treatment and medical attention require an officer to exercise discretion) (citing *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990)).  If the booking conduct was discretionary, the Court has already found that neither McCallum nor Mattson demonstrated deliberate indifference.  And even assuming the booking conduct was ministerial, there is no evidence showing that these two particular Individual Defendants had reason to believe Erickson was experiencing a serious medical need and they failed to perform a ministerial duty.   Accordingly, the Court finds that McCallum and Mattson are entitled to official immunity on Count 3 and summary judgment is granted to them.

In addition, by virtue of vicarious official immunity, their respective employers, Pope County, Sheriff Riley, Todd County, Sheriff Och, and Jail Administrator Wright, in his official capacity, are entitled to official immunity as to the portion of Plaintiffs' negligence claim based on the conduct of McCallum and Mattson. *Anderson*, 678 N.W.2d at 663–64 (stating that generally, if official immunity applies to a public official on a particular issue, vicarious official immunity applies to his or her government employer

based on claims arising from the employee's conduct).    The Court therefore grants summary judgment to these Defendants as to Count 3, based on vicarious official immunity, limited to the conduct of McCallum and Mattson.

As to the remaining County Defendants, the Court has found that disputed issues of material fact remain in dispute as to deliberate indifference. *See supra* at II.B.4.  The resolution of many of these factual disputes may inform the larger question of whether the remaining Individual County Defendants' actions were ministerial or discretionary.  And to the extent those facts resolve in finding particular conduct discretionary, those same facts will be relevant to the determination of deliberate indifference, and consequently, official immunity and vicarious official immunity.

Accordingly, the Court denies the remaining County Defendants' summary judgment motion based on official immunity.  Similarly, to the extent Plaintiffs seek summary judgment on this defense, (Pls.' Mem. at 91), it is denied.  The Court therefore proceeds to address the parties' arguments regarding the substance of Plaintiffs' negligence claim.

### 2.    Wrongful Death Based on Negligence

The County Defendants contend that Plaintiffs' wrongful death claim against them fails on the merits because the risk of harm to Erickson was not foreseeable.  (Cnty. Defs.' Mem. at 39–40.)  Plaintiffs, however, argue that the County Defendants had a direct duty to provide medical care, and the issue of foreseeability is inapplicable.  (Pls.' Opp'n at 53–54.)  Even if foreseeability is at issue, they contend, the record establishes that Erickson's death was foreseeable to the County Defendants.  (*Id*. at 54–55.)

Minnesota's wrongful death statute provides that when death is caused by a person's wrongful act or omission, the decedent's trustee may maintain an action on the decedent's behalf, as if the decedent had lived, for an injury caused by the defendant's act or omission. Minn. Stat. § 573.02, subd. 1.  Under Minnesota law, a plaintiff alleging negligence in a wrongful death action must prove the following:  (1) the defendant owed a duty to the decedent; (2) the defendant breached the duty; (3) there was a death; and (4) the breach of the duty caused the death.  *Mertes v. City of Rogers*, No. 17-cv-4508 (SRN/SER), 2019 WL 3306147, at *6 (D. Minn. July 23, 2019) (citing *Stuedemann v. Nose*, 713 N.W.2d 79, 93 (Minn. Ct. App. 2006)).

### a.    Duty and Foreseeability

The County Defendants argue that the "general duty to exercise reasonable care to safeguard prisoners" only arises when the jailer knows, or should know, that the specific harm was foreseeable.  (Cnty. Defs.' Mem. at 39–40) (citing *Cooney v. Hooks*, 535 N.W.2d 609, 611 (Minn. 1995); Cnty. Defs.' Opp'n at 40–45.)  They contend that foreseeability is lacking here, and they are entitled to summary judgment.  (Cnty. Defs.' Mem. at 39–40; Cnty. Defs.' Opp'n at 40–45.)

Plaintiffs respond that the duty in this case is not the general duty of care to "safeguard prisoners," but the more specific duty to provide medical treatment, "and foreseeability has nothing to do with it."  (Pls.' Opp'n at 53–54.)  Affirmatively, Plaintiffs argue that they are entitled to summary judgment because Defendants had a constitutional and statutory duty to provide medical care to Erickson, they breached that duty by denying care, and the denial of care resulted in his death.  (Pls.' Mem. at 89–91.)

In the Second Amended Complaint, Plaintiffs allege that the County Defendants "had a duty to care for, protect, and provide medical treatment to Erickson while he was in their custody."  (Second Am. Compl. ¶ 129.)   They further assert that the  County Defendants "had a specific duty to care for him because they could reasonably foresee his obvious need for medical attention."  (*Id*.) (citing *Cooney*, 535 N.W.2d at 611).

As the Court has observed, the Constitution imposes a duty on the government to provide medical treatment for prisoners.  *Estelle*, 429 U.S. at 103.   Minnesota statutory law likewise imposes the same requirement.  Minn. Stat. § 641.15; *Aitkin Cnty. v. Dep't of Corr.*, 394 N.W.2d 608, 610 (Minn. Ct. App. 1986).   There is also a more general duty requiring the government to "exercise reasonable care to safeguard prisoners," *Cooney*, 535 N.W.2d at 611, based on prisoners' inability to provide self-protection while in custody.  *Harper v. Herman*, 499 N.W.2d 472, 474 (Minn. 1993).

Foreseeability appears to be primarily relevant in cases involving the general duty, and when the harm was inflicted by a third party, or self-inflicted by the prisoner, in the case of suicide.  *See, e.g., Doe 169 v. Brandon*, 845 N.W.2d 174, 177–78 (Minn. 2014) (finding no foreseeable risk of injury, and no duty, after church council renewed minister's license and minister subsequently assaulted a volunteer, stating, "Minnesota law follows the general common law rule that a person does not owe a duty of care to another—e.g., to aid, protect, or warn that person—if the harm is caused by a third party's conduct."); *Cooney*, 535 N.W.3d at 611–12 ("The jailer's duty to protect an inmate from violence arises when the jailer knows, or, in the exercise of reasonable care, should know of the danger of attack."); *Mertes*, 2019 WL 3306147, at *7 (noting that the law only imposes a

duty on a defendant to protect a plaintiff against suicide if that specific harm was foreseeable).

In this case, Plaintiffs argue that the County Defendants' duty, imposed by the Constitution, was to provide medical care directly to Erickson, who was unable to provide for his own care.  The Court agrees that this duty is more specific than the general duty to protect inmates, and no third parties caused the harm to Erickson, nor did he injure himself.  However, on summary judgment, Plaintiffs identify no affirmative Minnesota authority in support of their position that foreseeability is irrelevant to the finding of a duty, persuasive as it is, and they invoked the issue of foreseeability in the pleading of their negligence claim, citing Minnesota authority involving third-party harm.  (Second Am. Compl. ¶ 130) (citing *Cooney*, 535 N.W.2d at 611).

Although the existence of a duty is a question of law for the court, *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011), at this time, and under these facts, the Court need not decide whether foreseeability must be present to determine the existence of a duty. Assuming that it is, disputed issues of material fact preclude a finding that the risk of injury to Erickson was foreseeable.

The Minnesota Supreme Court has explained, "To determine whether the risk of injury to the plaintiff is foreseeable, we look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility." *Doe 169*, 845 N.W.2d at 178 (internal quotations and citations omitted).  "The risk must be clear to the person of ordinary prudence." *Id*. (internal citations and quotations omitted).  As the Court has discussed earlier, questions of fact remain regarding Erickson's

condition, as there is evidence in the record showing that for a considerable period of time, he was unresponsive and incoherent.   In fact, he was so intoxicated that officers could not book him into the jail and medically screen him for 11 hours.  Erickson also asked about his seizure medication, may have suffered from DTs and seizures, and complained about the cold temperature in the jail.  He did not receive any of his medications, including his medication for alcohol withdrawal and seizures, until 24 hours after his arrival at the Todd County Jail.  There is also evidence in the record showing that corrections officers were aware of his extremely high BAC upon arrest, and had reason to know that he was an alcoholic.  And there is evidence in the record that corrections officers knew that alcoholic withdrawal was a life-threatening condition.  In light of this evidence, even if foreseeability is a required element of duty, disputed issues of material fact preclude summary judgment for the remaining Todd County Defendants and Plaintiffs.

Furthermore, disputed issues of material fact regarding breach and causation also preclude summary judgment. (*Cf.* Pls.' Mem. at 90 (noting Defendants' testimony that alcohol withdrawal can be fatal, expert opinion that treatment reduces mortality for severe withdrawal from 15-35% to less than 1%, and that Erickson's cause of death was from "complications of chronic alcoholism") *with* Todd Cnty. Defs.' Opp'n at 42 (discussing Sobiech's well-being check at 5:06, and Erickson's use of the bathroom prior to medical event).

For all of these reasons, in light of disputed issues of material fact, the Court denies summary judgment to the remaining Todd County Defendants and Plaintiffs on the wrongful death claim alleging negligence (Count 3).

**E.      Wrongful Death Based on Medical Malpractice Against CentraCare Defendants (Count 4)**

CentraCare and the Individual CentraCare Defendants, Sticha, Nimmo, and Hock contend they are entitled to summary judgment on Plaintiffs' state law claim for wrongful death based on medical malpractice because Plaintiffs cannot establish the essential elements of the claim. (CentraCare's Mem. at 18–20.)   Plaintiffs argue that the evidence is undisputed, each element of the claim is met,  and seek summary judgment in their favor. (Pls.' Mem. at 92–96.)

A plaintiff asserting a claim for medical malpractice must prove the following elements:  "(1) the applicable standard of care; (2) the defendant's departure from that standard of care; and (3) that the departure from the standard of care directly caused the patient's injury." *Smits v. Park Nicollet Health Servs.*, 955 N.W.2d 671, 678 (Minn. Ct. App. 2021) (citing *Becker v. Mayo Found.*, 737 N.W.2d 200, 216 (Minn. 2007), *review granted* (Minn. May 18, 2021)).  In a wrongful death case based on medical malpractice, the plaintiff must offer expert opinion that the defendant's breach of the standard of care was a direct cause of the decedent's death. *Smith v. Knowles*, 281 N.W.2d 653, 655 (Minn. 1979).  As to the element of causation, under traditional principles of tort law, a plaintiff must prove that it is "more probable than not" that the harm or death resulted from the defendant health care provider's negligence.  *Dickhoff v. Green*, 836 N.W.2d 321, 333 (Minn. 2013) (citing *Leubner v. Sterner*, 493 N.W.2d 119, 121 (Minn. 1992)).

Moreover, an implicit prerequisite for a medical malpractice claim, as with all negligence claims, is the existence of a duty owed by the defendant to the plaintiff. *Smits*,

955 N.W.2d at 672 ("[S]o enshrined is this duty that it is not separately identified as an element of a medical malpractice claim brought by a patient.") (citations omitted).

### 1.   Duty

To the extent the CentraCare Defendants argue that they were under no duty of care to Erickson because they did not treat him in person, the Court disagrees.[16]   (*See* CentraCare's Mem. at 19) ("While Plaintiffs place blame on the CentraCare Defendants, it is important for the Court to keep in mind the very important fact of this case that no CentraCare Defendant ever interacted with Erickson.").   The contract between Todd County and CentraCare required CentraCare to provide medical care to Todd County Jail detainees.   (2015 Todd Cnty./CentraCare Agmt. at P/T 2543.)   As such, because "[Todd County bore an affirmative obligation to provide medical care to [Erickson]," by "delegate[ing] that function to [CentraCare], . . . [CentraCare] voluntarily assumed that obligation by contract."   *West*, 487 U.S. at 54–56.   Under Minnesota law, medical providers owe a duty of care to patients that "is not contingent on [their] custody or control of [him]."   *Smits*, 955 N.W.2d at 680 (finding mental health provider owed a common law duty of care to decedents' estates based on underlying physician-patient relationship, regardless of custody or control of patient).

Moreover, CentraCare's own medical records demonstrate that Erickson was an established CentraCare patient, for whom CentraCare maintained a file.   In fact, he had

---

[16] In their Reply, the CentraCare Defendants contend that Plaintiffs misinterpreted their argument about the lack of in-person treatment, and clarify that it is relevant to the issue of breach.   (CentraCare's Reply at 10.)

received patient care for alcohol-withdrawal from other CentraCare providers on April 15, 2017, only a few weeks before his death in the Todd County Jail.[17]  (CentraCare Records at CC-1088–89.)

Accordingly, to the extent the CentraCare Defendants seek summary judgment on the basis that they owed no duty of care to Erickson because they did not treat him in person, it is denied.

### 2.    Applicable Standard of Care

Plaintiffs argue that the applicable standard of care in this case is undisputed, citing CentraCare's admission that its protocols accurately state the standard of care.  (Pls.' Mem. at 94.)  CentraCare disagrees, arguing that its own policies do not establish the standard of care.  (CentraCare's Opp'n at 13.)

The standard of care that a plaintiff must establish in a medical malpractice claim is the "degree of skill and care possessed and exercised by practitioners engaged in the same type of practice under like circumstances."  *Smits*, 955 N.W.2d at 678 (quoting *Becker*, 737 N.W.2d at 216) (quotations omitted).  In addition to offering expert opinion on causation, a plaintiff in a medical malpractice case must also offer expert opinion on the applicable standard of care.  *Walton v. Jones*, 286 N.W.2d 710, 714 (Minn. 1979).

---

[17] These CentraCare records document Erickson's symptoms, which included shakiness, progressively worsening tremors, and sweating, for which emergency room staff administered titrating doses of Lorazepam and potassium, after having assigned Erickson an alcohol withdrawal score of 16.  (CentraCare Records at CC-1088–90.)  The CentraCare Defendants here could have accessed these patient records.  (Nimmo Dep. at 76–78.)

Plaintiffs' experts, Dr. Keller and Nurse Roscoe, opine on the applicable standard of care, (Keller Report at 6; Umsted Decl., Ex. O (Roscoe Report) at 8, 11, 13), and CentraCare's expert, Dr. Fowlkes offers a rebuttal of their opinions. (Fowlkes Report at 21–59.) In addition to expert testimony, CentraCare's interrogatory answers, related protocols, and testimony are certainly relevant to the determination of the applicable standard of care, subject to their admissibility. However, at this time, the Court finds that the applicable standard of care remains in dispute. To the extent that CentraCare argues that the protocols cannot be admitted in light of *Damgaard v. Avera Health*, 108 F. Supp. 3d 689, 698–99 (D. Minn. 2015), and Minn. Stat. § 145.65, this argument is best addressed in a motion in limine.

### 3.    Departure from the Standard of Care and Causation

Plaintiffs contend that they are entitled to summary judgment because the CentraCare Defendants' departure from the standard of care caused Erickson's death. (Pls.' Mem. at 96.) By contrast, the CentraCare Defendants argue that Plaintiffs have failed to meet their burden with respect to these elements, and instead, the CentraCare Defendants are entitled to summary judgment. (CentraCare's Mem. at 18–20; CentraCare's Opp'n at 12–14.)

Summary judgment is inappropriate, however, because numerous issues of material fact remain in dispute concerning the departure from the standard of care and causation. For example, Plaintiffs contend that based on the CentraCare Defendants' knowledge as medical professionals, they had sufficient facts to alert them to Erickson's need for alcohol withdrawal care, including the timely administration of prescribed medication for alcohol

withdrawal, but they failed to act.  (Pls.' Opp'n. at 59–60.)  For their part, the CentraCare

Defendants assert that none of the corrections officers at the Todd County Jail reported that

"Erickson was acting in a manner that required any urgent care or assessment," and they

further reference jail videos showing Erickson walking and conversing at various times—

evidence negating any need for them to physically assess Erickson in person, they argue.

(CentraCare's Mem. at 19; CentraCare's Opp'n at 13–14.)  In sum, many disputed issues

of material fact remain in dispute on the departure from the standard of care and causation.

The parties have offered competing expert opinions relevant to these issues, along with

deposition testimony from the CentraCare Defendants and other fact witnesses, and

documentary and digital evidence from which the factfinder will resolve whether the

CentraCare Defendants departed from the standard of care and, if so, whether it is "more

probable than not" that such departures caused Erickson's death.

Accordingly, based on disputed issues of material fact, the Court denies the

summary judgment motions filed by Plaintiffs and the CentraCare Defendants regarding

Plaintiffs' claim for wrongful death based on medical malpractice.

### F.    Plaintiffs' Motion for Sanctions

In addition to summary judgment, Plaintiffs move for sanctions against Defendant

Todd County for the allegedly intentional destruction of evidence.  Specifically, they

contend that Todd County intentionally failed to preserve the video record of Erickson's

entire stay at the Todd County Jail, and specifically the footage from inside Erickson's

holding cell.  For this discovery misconduct, Plaintiff requests the Court use its inherent

authority to issue an adverse inference instruction to the jury.

Spoliation involves "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Nicollet Cattle Co., Inc. v. United Food Grp., LLC*, No. 08-5899 (JRT/FLN), 2010 WL 3546784, at *4 (D. Minn. Sept. 7, 2010) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). When spoliation occurs, Federal Rule of Civil Procedure 37(e) authorizes the court to fashion sanctions appropriate to remedy the injury:

> (e) Failure to Preserve Electronically Stored Information.  If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1)  upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2)  only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > >
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

If the destruction of evidence occurred prior to litigation, the court must determine when a duty to preserve the evidence arose.  *E*Trade Sec. LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 587 (D. Minn. 2005).  Generally, the obligation "begins when a party knows

or should have known that the evidence is relevant to future or current litigation." *Id.* at 588.

If the destruction occurred according to a routine document retention policy, the sanction-requesting party must show intentional bad faith. *Stevenson v. Union Pac. R.R.*, 354 F.3d 739, 747 (8th Cir. 2004). Because direct evidence of intent is often lacking, district courts have "substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004). When assessing intent in the context of a routine retention policy, courts should consider, "(1) whether the record retention policy is reasonable considering the facts and circumstances surrounding those documents, (2) whether lawsuits or complaints have been filed frequently concerning the type of records at issue, and (3) whether the document retention policy was instituted in bad faith." *Stevenson*, 354 F.3d at 746.

Finally, to warrant sanctions, there must be prejudice to the requesting party, which can be demonstrated by the nature of the lost evidence; for example, prejudice is likely when the electronic information is the only contemporaneous recording of the incident. *Id.* at 748.

Here, Plaintiffs allege that Todd County intentionally destroyed all video of Erickson in his cell prior to 4:59 p.m. and in the booking area prior to 11:17 a.m. on May 7. (Pls.' Mem. Supp. Sanctions at 8.) Plaintiffs argue that Todd County's duty to preserve all video of Erickson began the day after Erickson died, when the Minnesota DOC sent an Inmate Death Evaluation letter to Todd County directing it to submit "Video footage of

where the incident occurred." (*Id.* at 3, 8; DOC Investig. Report at TEMNDC 14.) Plaintiffs argue that this early notice, combined with the conflicting testimony of the Todd County Jail Administrator and the DOC Inspector on the preservation request, demonstrate an intentional effort to destroy evidence that Todd County knew to be relevant. (Pls.' Mem. Supp. Mot. for Sanctions at 8-9.) Loss of the recording is prejudicial, Plaintiffs contend, because it is the most objective evidence of Erickson's condition and the officers' actions before his death. (*Id.* at 9.)

Todd County, however, contends the DOC letter did not put it on notice to preserve; rather, the duty was only triggered when it received Plaintiff's notice of claim. (Cnty. Defs.' Opp'n Sanctions at 8-11.) It counters that the DOC letter did not request that Todd County preserve "all" video evidence of Erickson, and that it did in fact comply with the DOC's request to send video of Erickson's death. (*Id.* at 11-12.) When Todd County received Plaintiff's request for all video of Erickson, it contends that it attempted in good faith to retrieve the additional video, but the jail video log had recorded over itself according to policy. (*Id.* at 4, 10–12.) Under such circumstances, it asserts the court cannot find bad faith. (*Id* at 12.) Lastly, Todd County maintains that it is equally prejudiced by the loss of the video. (*Id.*)

The Court finds that the current record is insufficient to support a ruling on Plaintiffs' motion at this time. Among other things, the Court is not in a position to assess the credibility of Todd County's witnesses based only on depositions, making it inappropriate to rule on whether their conflicting explanations evidence an intent to suppress the truth. Additionally, the record does not contain detailed information about

the record retention policy itself and how frequently DOC letters of this nature lead to litigation.  For these reasons, the Court defers ruling on Plaintiffs' Motion for Sanctions and will conduct an evidentiary hearing prior to trial, at a date and time to be determined.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. **The County Defendants' Motion for Summary Judgment [Doc. No. 71] is GRANTED IN PART, DENIED IN PART, and DENIED AS MOOT IN PART.**

2. **The CentraCare Defendants' Motion for Summary Judgment [Doc. No. 81] is GRANTED IN PART and DENIED IN PART.**

3. **Plaintiffs' Motion for Summary Judgment [Doc. No. 85] is DENIED.**

4. **Plaintiffs' Motion for Sanctions for Spoliation of Evidence [Doc. No. 103] is DEFERRED pending an evidentiary hearing.**

5. **This Order is temporarily filed under seal because certain exhibits referenced in the Order were filed under seal.  Within seven (7) days of the date of this Order, the parties are ORDERED to show cause as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long.  To that end, the parties must file (under seal) a joint brief, no longer than five (5) pages, and/or a proposed Redacted Order, if they would like portions to remain under seal.**

6. **This matter is scheduled for trial on Tuesday, September 20, 2022 at 9:00 a.m. in Courtroom 7B, Warren E. Burger Federal Courthouse and United States Courthouse, 316 North Robert Street, St. Paul, Minnesota.  The Court will issue a Trial Notice and Final Pretrial Order in due course.**

Dated: May 6, 2022                          s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge